328 F.2d 634
 Louis H. LEWIS and Annette Lewis, Estate of Hyman Furst, Deceased, by Louis H. Lewis, Executor, and Samuel Pearl and Mary Pearl, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 14274.
 United States Court of Appeals Seventh Circuit.
 March 2, 1964.
 
 William P. Rosenthal, Leonard Schanfield, Stuart K. Taussig, Chicago, Ill., for petitioners.
 Louis F. Oberdorfer, Asst. Atty. Gen., Arthur E. Strout, Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, Washington, D. C., for respondent.
 Before HASTINGS, Chief Judge, and KNOCH and KILEY, Circuit Judges.
 HASTINGS, Chief Judge.
 
 
 1
 Taxpayers'[1] petition for review of eight decisions of the Tax Court of the United States determining deficiencies in the tax due from them in the total amount of $285,306.98. T.C.Memo. 1962-306. The cases were consolidated for trial and for the purposes of this review.
 
 
 2
 The facts in each of the cases are substantially identical, except for the amounts involved. On this review it shall be sufficient to consider the facts referring to Louis H. Lewis.
 
 
 3
 We are concerned with the tax years 1955 through 1959.
 
 
 4
 The decisions of the Tax Court were based on its conclusions that:
 
 
 5
 (1) certain amounts claimed as interest deductions in 1955 and 1956 arising out of loans incurred to purchase United States Government securities were not deductible;
 
 
 6
 (2) taxpayers' out-of-pocket expenses or losses incurred in such securities transactions were not deductible; and
 
 
 7
 (3) amounts claimed as expenses of borrowing securities in 1957 and of carrying a short position during 1957, 1958 and 1959 were not deductible.
 
 
 8
 On this review, no appeal is taken from that portion of the Tax Court's decisions disallowing the deductions claimed for interest expenses. This holding appears to be well established by an unbroken line of decisions. Regardless of a taxpayer's motives, where a paper transaction lacks substance and no genuine indebtedness is created resulting in a bona fide debtor-creditor relationship, no interest can be said to have been paid for the use or forbearance of money actually loaned and no interest expense deduction may flow therefrom. Bridges v. C. I. R., 4 Cir., 325 F.2d 180 (1963); Salley v. C. I. R., 5 Cir., 319 F.2d 847 (1963); Nichols v. C. I. R., 5 Cir., 314 F.2d 337 (1963); Rubin v. United States, 7 Cir., 304 F.2d 766 (1962); MacRae v. C. I. R., 9 Cir., 294 F.2d 56 (1961), cert. denied, 368 U.S. 955, 82 S.Ct. 398, 7 L.Ed.2d 388; Kaye v. C. I. R., 9 Cir., 287 F.2d 40 (1961); Becker v. C. I. R., 2 Cir., 277 F.2d 146 (1960); Lynch v. C. I. R., 2 Cir., 273 F.2d 867 (1959); Goodstein v. C. I. R., 1 Cir., 267 F.2d 127 (1959); Broome v. United States, 170 F.Supp. 613, 145 Ct.Cl. 298 (1959). Cf., Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960); Deputy v. DuPont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940); Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).
 
 
 9
 This review presents another variant of the plans devised by M. Eli Livingstone, a Boston broker, several of which were the subject of some of the foregoing decisions. They have generally been concerned with a plan for reducing income taxes through the device of claiming deductions for alleged payment of interest on loans to finance the purchase of Government securities.
 
 
 10
 Two plans are involved in the instant case. The Tax Court's findings of fact and opinion are not officially reported. This requires a summary statement of the facts in each situation.
 
 
 11
 The November, 1955 Transaction.
 
 
 12
 On November 22, 1955, Lewis directed Livingstone to purchase for his account $1,000,000 face value United States Treasury 2 7/8% notes due March 15, 1957, with interest coupons due March 15 and September 15, 1956, detached.
 
 
 13
 Livingstone confirmed the purchase at a price of 97½, a total of $975,000. Livingstone also granted Lewis an irrevocable option, or "put," to sell the notes back to Livingstone on September 15, 1956 at a price of 100¾. There was no charge for the "put."
 
 
 14
 At the same time, Livingstone sent Lewis a note for $975,000 payable to Corporate Finance & Loan Corporation (CF&L),[2] letters of instructions for Lewis' signature and Livingstone's check to Lewis for $32,500. This amount was paid to Lewis as security for the option granted him to sell the notes to Livingstone at the agreed price. Lewis retained the $32,500 and it was accounted for at the close of the transaction in 1956, when it was charged to his account. Livingstone acted as principal in the sale of the bonds and charged no commission.
 
 
 15
 Lewis was requested to sign the note and letters of instruction and return them to Livingstone, together with Lewis' check for $40,218.75 payable to CF&L. The check was purportedly a prepayment of interest. With the letter prepared for him by Livingstone, Lewis directed him to deliver the Treasury notes against payment of $975,000 to CF&L, and directed CF&L to pay this sum and receive the notes from Livingstone.
 
 
 16
 Lewis signed the note prepared by Livingstone. It was dated November 22, 1955, calling for the payment in one year of $975,000 to CF&L, with interest at 4 1/8% ($40,218.75) prepaid. It recited that Lewis had deposited the $1,000,000 Treasury 2 7/8% notes as collateral with CF&L. There was no provision for reimbursement of interest in event of prepayment of principal.
 
 
 17
 The transaction was recorded on the CF&L books with a debit entry of $975,000 to "Notes Receivable, Clients," and a credit entry in the same amount to "Loans Receivable, Livingstone & Co."
 
 
 18
 Livingstone placed a buy order with another dealer in Government securities, designated for Lewis' account, directing delivery of the $1,000,000 Treasury 2 7/8% notes due March 15, 1957, to a New York bank against payment. He instructed the bank to receive the securities against payment. He also placed another order directing a sale for the account of CF&L, and the receipt of the $1,000,000 2 7/8% notes from the bank against payment. He instructed the bank to deliver the securities to the dealer against payment. He paid the dealer the differential between the purchase and sale prices. The bank, which debited and credited Livingstone's account in the amounts of the sale and purchase prices, was paid a clearing fee for its services.
 
 
 19
 The Treasury notes never left the office of the dealer. Neither Lewis, Livingstone nor CF&L ever acquired actual physical possession of them. A confirmation slip sent by the dealer mentioned Lewis by name only, at Livingstone's request.
 
 
 20
 Lewis issued a check dated December 1, 1955 for $40,218.75, payable to CF&L. This was reflected as payment of interest on the $975,000 note.
 
 
 21
 The next year, on September 5, 1956, Livingstone sent Lewis a letter enclosing documents necessary to close out the transaction. A confirmation slip dated September 15, 1956, from Livingstone to Lewis showed that Livingstone had purchased from him the $1,000,000 Treasury notes at 100¾%. Lewis directed CF&L to deliver the same amount of such securities to Livingstone against payment of $975,000 by Livingstone. CF&L was directed to use the proceeds to discharge Lewis' outstanding loan.
 
 
 22
 Livingstone issued a statement to Lewis showing a credit of $1,007,500 for the sale of the notes and debits of $975,000 and $32,500, leaving a zero balance. CF&L made entries on its books reflecting receipt of $975,000 due on Lewis' loan and sent him his one-year note for $975,000, marked as paid.
 
 
 23
 The net out-of-pocket expense to Lewis resulting from this transaction was $7,718.75 — the difference between the amount purportedly prepaid as interest ($40,218.75) and the amount received from Livingstone as security for the "put" ($32,500).
 
 
 24
 At the same time, similar transactions were entered into by the other taxpayers. On March 22, 1956, the taxpayers each entered into a second and similar transaction planned by Livingstone. It was closed out on March 5, 1957. The net out-of-pocket expense to Lewis on this plan was $7,772.93, computed on the same basis as the year before.
 
 
 25
 The May, 1957 Transaction.
 
 
 26
 Livingstone proposed this plan to Lewis in a letter of January 4, 1957, involving a short sale of Treasury bonds and the purchase of Treasury notes.
 
 
 27
 On May 7, 1957, Lewis instructed Livingstone to sell short for his account $3,000,000 United States Treasury 2¾% bonds due September 15, 1961, and to sell to him $3,000,000 United States Treasury 1½% notes due October 1, 1961.
 
 
 28
 Livingstone thereupon placed an order with Salomon (a Government securities dealer), designated for Lewis' account, for the sale to Salomon of $3,000,000 Treasury 2¾% bonds due September 15, 1961; delivery of such bonds to be made the next day to Childs (another dealer). Lewis directed Livingstone Securities Corporation (LSC), an entity controlled by Livingstone, to deliver the bonds to Salomon against payment to Salomon of $2,922,105.98, and directed Salomon to receive the bonds from LSC.
 
 
 29
 On May 6, 1957, LSC sold to Lewis, as agent for another, $3,000,000 United States Treasury 1½% notes due October 1, 1961, for a total price of $2,753,299.18, including interest. No commission was charged on this transaction.
 
 
 30
 At the same time, LSC placed an order with Childs for purchase by it of $3,000,000 Treasury 2¾% bonds due September 15, 1961, with delivery to Salomon for Lewis' account, and directed Salomon to receive these bonds from Childs and pay $2,922,105.98.
 
 
 31
 The following day, on May 8, 1957, Lewis acknowledged receipt of the Treasury 2¾% bonds purchased from Childs and simultaneously sold short to Salomon. He further agreed to deposit with Livingstone the $3,000,000 Treasury 1½% notes and $168,806.80 in cash. $168,806.80 represented the excess of the proceeds from the short sale of the 2¾% bonds over the amount paid for the 1½% notes. This sum was to be used, along with coupon interest on the 1½% notes, to reimburse Livingstone for coupon interest due Livingstone on the 2¾% bonds Lewis had allegedly borrowed to cover his short sale.
 
 
 32
 Lewis further agreed to pay Livingstone $33,750 as a premium for the alleged loan of the 2¾% bonds. Livingstone acknowledged receipt of the 1½% notes and $168,806.80 cash to be held as collateral security for return of the borrowed 2¾% bonds.
 
 
 33
 On May 21, 1957, LSC notified Lewis that in his purchase of the 1½% notes and the delivery of the 2¾% bonds, it had acted as agent for Livingstone and that Lewis' contract was solely with Livingstone.
 
 
 34
 In 1957, Lewis issued four checks to Livingstone, each for $8,437.50, or a total of $33,750, in payment of the premium hereinabove referred to.
 
 
 35
 By letter of January 15, 1958, Livingstone advised Lewis that in 1957 Lewis had been charged an expense of $29,144.02 in connection with borrowing the 2¾% bonds and had paid a premium of $33,750 for borrowing these bonds.
 
 
 36
 In January, 1959 and January, 1960, Livingstone further advised Lewis that he had been charged a coupon expense of $82,500 in each of the years 1958 and 1959 in connection with the borrowed bonds.
 
 
 37
 The other taxpayers entered into similar transactions in the same years.
 
 
 38
 In their tax returns for 1955 and 1956, each of the taxpayers deducted the amounts allegedly paid as interest to CF&L to borrow funds necessary to purchase the Treasury 2 7/8% bonds in the November, 1955 transaction.
 
 
 39
 In their tax returns for 1957, 1958 and 1959, each of the taxpayers deducted the amounts claimed as expenses in connection with the short sale in the May, 1957 transaction.
 
 
 40
 The Commissioner disallowed both the claimed interest deductions for 1955 and 1956, and the deductions claimed for the cost of borrowing Treasury bonds in 1957, 1958 and 1959.
 
 
 41
 The Tax Court sustained the Commissioner's determination. It further held that the out-of-pocket expenses or losses incurred in the November, 1955 transaction were not deductible either as expenses or as capital losses.
 
 I.
 
 42
 Taxpayers contend that their out-of-pocket expenses or losses incurred in the November, 1955 transaction are deductible in full from gross income under the Internal Revenue Code of 1954.
 
 
 43
 They first argue that such expenses are deductible under the provisions of § 165(c) (2) of the 1954 Code[3] as a loss on a transaction entered into for profit because petitioner reasonably expected to receive an after-tax profit on the transaction.
 
 
 44
 The Tax Court found that the "facts show that the only profit petitioners could reasonably expect was in tax benefit." This tax benefit could only result in an after-tax profit on the transactions under scrutiny. Here they sought to do this by creating a fictitious interest deduction. In that they have failed. They now would seek reward for expenses incurred in achieving this failure. We find no support for holding that such a transaction is one "entered into for profit" within the meaning of the statute.
 
 
 45
 As indicated in Rubin v. United States, 7 Cir., 304 F.2d 766, 770 (1962), and most of the other cases cited above in support of the denial of the interest deduction, the transaction was without substance and was a paper transaction amounting only to a "financial round robin."
 
 
 46
 The Tax Court held in Eli D. Goodstein, 30 T.C. 1178, 1192-1193 (1958), affirmed 1 Cir., 267 F.2d 127, "Since the petitioner did not intend to purchase and did not purchase any Treasury notes, it cannot be said that there was a transaction entered into for profit within the meaning of section 23(e) of the Internal Revenue Code of 1939. [§ 165(c) of the 1954 Code.] * * * It is clear that the type of transaction in which the statute refers to is one which has substance and in which there is a true motive of deriving a profit." We agree.
 
 
 47
 In the alternative, taxpayers argue that the out-of-pocket expenses in the November, 1955 transaction are deductible as professional fees. That is, the payments made to Livingstone were for services rendered, under the provisions of § 212 of the 1954 Code.[4]
 
 
 48
 As we have held, the transaction was without substance. Livingstone's plan was supposed to diminish taxpayers' tax liability. The motivating factor causing taxpayers to enter into the transaction was to secure large interest deductions. It had no business origin. The "professional fee" paid to Livingstone did not arise in connection with taxpayers' profit-seeking activities. What taxpayers sought to gain was a consequence resulting in a lower tax.
 
 
 49
 As the court said in MacRae v. C. I. R., 9 Cir., 294 F.2d 56, at 59, 60 (1961), "To allow such out-of-pocket expenditure as a loss incurred in a transaction entered into for profit would be inconsistent with our affirmance of the Tax Court holding that the transactions here involved were not in substance purchases of securities with borrowed money entered into for profit, but were in reality attempts to simulate such security transactions for the purpose of artificially creating tax deductions." We agree.
 
 
 50
 We hold that the expense paid to Livingstone, under the facts of this case, finds no support in the statutory scheme. To rule otherwise would be to read into the statute a meaning that would avoid the purpose inherent in granting deductions from gross income.
 
 II.
 
 51
 Since we hold that taxpayers' out-of-pocket expenses incurred in the November, 1955 transaction are not deductible in full on the grounds presented in the preceding section of this opinion, taxpayers contend that such losses are deductible as long term capital losses. They rely on the holdings of the Second Circuit in Lynch v. C. I. R., 273 F.2d 867 (1959) and Becker v. C. I. R., 277 F.2d 146 (1960); the Ninth Circuit in MacRae v. C. I. R., 294 F.2d 56 (1961); and dicta by the First Circuit in Goodstein v. C. I. R., 267 F.2d 127 (1959). We respectfully disagree.
 
 
 52
 The claim for such a deduction is necessarily based on the provisions of § 1234 of the 1954 Code.[5] The equivalent and predecessor section of the 1939 Code, § 117(g) (2), was in issue in Becker and MacRae.
 
 
 53
 The only applicable provision in § 1234 is that referring to a "loss attributable to failure to exercise, a privilege or option to buy or sell property." What were the options, if any, granted by Livingstone to Lewis? One option was the "put" granted to Lewis to sell the notes back to Livingstone on September 15, 1956 at a price of 100¾. The statute is not applicable to this option for the reason that it was exercised by Lewis according to the terms of the paper plan transaction. Thus, by selling the notes to Livingstone for $1,007,500, everything was equalized except the difference of $7,718.75 which represented Livingstone's fee for the scheme.
 
 
 54
 Apparently, the option Lewis had in mind and the one considered in Becker and MacRae, was the option to terminate the transaction at any time by having Livingstone deliver the Government notes to Lewis, thereby halting the running of interest. We fail to see that the right to terminate the loan can be considered an "option to buy or sell property." Further, there was no showing that any prepayment of the loan would result in any partial refund of the prepaid interest.
 
 
 55
 Finally, we believe the fallacy in the "option" argument is the same fatal weakness that caused the courts to deny the "interest" payment or the out-of-pocket expense as an ordinary deduction for loss or business expense. That fallacy is the uniform holding that the whole scheme was a sham and had no substance as a business transaction entered into for profit or for the production of income. Having held that there was no intention on the part of Lewis to purchase or sell securities but only to effect a tax saving, it likewise must be considered a sham insofar as granting any such "option" as taxpayers now assert.
 
 
 56
 Although taxpayers contend there was an additional profit seeking motive, the Tax Court found to the contrary from the evidence before it. We find there is substantial evidence in the record to support this finding and that it should not be set aside.
 
 
 57
 We hold that the out-of-pocket expense may not be deducted by taxpayers as a long term capital loss in their returns for the two years involved.
 
 III.
 
 58
 The final question presented concerns the May, 1957 transaction. Taxpayers claim deductions for premiums paid for borrowing bonds and yearly expense incurred to maintain their short position. This applies to the taxable years 1957, 1958 and 1959.
 
 
 59
 Lewis claims he made a purchase of Government 1½% Treasury notes in 1957 and at the same time made a short sale of Government 2¾% Treasury bonds, using the 1½% notes as collateral for the loan from Livingstone of the 2¾% bonds sold short. We have hereinbefore set out this transaction in some detail.
 
 
 60
 Taxpayers argue that the premium of $33,750 paid to Livingstone by Lewis in 1957 and the interest payments on the short sale are deductible under § 212 of the 1954 Code, supra at fn. 4.
 
 
 61
 We think the Tax Court correctly decided this issue when it stated:
 
 
 62
 "* * * On May 7, 1957, Salomon confirmed the purchase of $3,000,000 in United States Treasury 2¾ percent bonds from Lewis at a total price of $2,922,105.98. The confirmation slip indicates that this amount would be paid on the following day in New York at Childs. On the same day, May 7, 1957, Livingstone placed an order with Childs for the purchase by it from Childs of $3,000,000 United States Treasury 2¾ percent bonds and their delivery against payment to Salomon for the account of Lewis. As a result of this simultaneous transaction, the short sale by Lewis of the 2¾ percent bonds was immediately canceled by the purchase of the identical bonds from another broker. Lewis' account with Salomon indicates that his credit balance resulting from the sale of the bonds was cleared on the following day by the delivery to Salomon of the identical bonds. No proof has been offered that Livingstone owned bonds of this kind in the amounts which he could loan Lewis or that Livingstone possessed funds in sufficient amount to purchase such bonds and lend them to petitioners. Nor is there any evidence that he did lend Lewis these bonds. Thus, the record indicates that Lewis never borrowed securities from Livingstone and that Lewis did not maintain a short position with regard to these bonds. We conclude that these transactions considered as a whole, had no independent economic or business purpose apart from anticipated tax benefits and were wholly without substance. * *
 
 
 63
 "Petitioners contend that the record demonstrates that they purchased the 1½ percent Treasury notes in 1957 and that there is nothing in the record to show that these notes were disposed of during the period here involved. The record does not support petitioners' contention. There is no evidence to show that these bonds were ever actually purchased by petitioners. However, even if petitioners had actually purchased the 1½ percent notes, they would not be entitled to deduct costs of maintaining a short position in 2¾ percent bonds which they had not in fact, borrowed. * * *"
 
 
 64
 This position finds support in the rationale of Rubin v. United States, 7 Cir., 304 F.2d 766 (1962) and other cases earlier cited in support of the denial of the "interest" deduction. This plan devised by Livingstone was a legitimate transaction. However, as we quoted the Tax Court in MacRae, 34 T.C. 20, at 26, in our opinion in Rubin, 304 F.2d at 770: "The steps taken, each in itself a legitimate commercial operation, were here each mirror images, and add up to zero. * * * The choice of the more complicated and involved method of doing nothing had no purpose, save the erection of the facade upon which petitioners now seek to rely."
 
 
 65
 The Tax Court properly found the facts and its finding is amply supported by the record.
 
 
 66
 Taxpayers contend that the transaction was real because Lewis would have made a cash profit if he had elected to cover his short sale on September 15, 1959. We answered that in Rubin, 304 F.2d at 770, where Judge Swygert, speaking for our court, aptly said, "Due to the fluctuations in the market it was likely that taxpayer would either make or lose money on the transaction; but this was incidental to the chimerical character of the transaction."
 
 
 67
 We hold that the Tax Court correctly decided that taxpayers were not entitled to deduct the expense of maintaining their short interest in the May, 1957 transaction in the tax years 1957, 1958 and 1959.
 
 
 68
 For the foregoing reasons, the decisions of the Tax Court under review in this proceeding are held to be correct and in all respects are now affirmed.
 
 
 69
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The taxpayer-petitioners are Louis H. Lewis and Annette Lewis; Estate of Hyman Furst, deceased, by Louis H. Lewis, Executor; and Samuel Pearl and Mary Pearl. Annette Lewis is the wife of Louis H. Lewis and Mary Pearl is the wife of Samuel Pearl. The wives did not participate actively in the transactions under scrutiny and are parties solely because joint returns were filed in the taxable years. Hyman Furst died in 1961 and his estate is represented by Louis H. Lewis, Executor
 
 
 [2]
 CF&L was a Massachusetts corporation. It received substantially all its business from Livingstone and paid him for his services
 
 
 [3]
 26 U.S.C.A. § 165 provides:
 "§ 165. Losses
 * * * * *
 "(c) Limitation on losses of individuals. — In the case of an individual, the deduction under subsection (a) shall be limited to —
 * * * * *
 "(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *."
 
 
 [4]
 26 U.S.C.A. § 212 provides:
 "§ 212. Expenses for production of income
 "In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year —
 "(1) for the production or collection of income;
 "(2) for the management, conservation, or maintenance of property held for the production of income; or
 "(3) in connection with the determination, collection, or refund of any tax."
 
 
 [5]
 26 U.S.C.A. § 1234 (1958) ed. provides:
 "§ 1234. Options to buy or sell
 "(a) Treatment of gain or loss. — Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).
 "(b) Special rule for loss attributable to failure to exercise option. — For purposes of subsection (a), if loss is attributable to failure to exercise a privilege or option, the privilege or option shall be deemed to have been sold or exchanged on the day it expired.
 * * *."