Leslie H. **JOCKMUS** and Esther N. Jockmus, Plaintiffs-Appellants,

v.

**UNITED STATES** of America, Defendant-Appellee.

No. 405, Docket 28537.

United States Court of Appeals Second Circuit.

Argued May 28, 1964.

Decided July 8, 1964.

Samuel Brodsky, New York City (Max Perl, New York City, on the brief), for plaintiffs-appellants.

Edward B. Greensfelder, Jr., Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and Gilbert E. Andrews, Washington, D. C., on the brief; Robert C. Zampano, U. S. Atty., for the District of Connecticut, of counsel), for the United States.

Before LUMBARD, Chief Judge, and WATERMAN and HAYS, Circuit Judges.

HAYS, Circuit Judge.

Leslie H. Jockmus and Esther N. Jockmus, who filed a joint return as husband and wife, appeal from a determination in a tax refund suit, 222 F.Supp. 781, that certain amounts paid during the taxable year 1956 were not deductible as interest on indebtedness, 26 U.S.C. §

163(a) (1958).[1] After a trial to the court, the district judge concluded that the case was controlled by a line of decisions holding in similar circumstances that the financial transactions lacked economic substance and did not result in any actual payment of interest. E. g. Becker v. Commissioner, 277 F.2d 146 (2d Cir. 1960); Lynch v. Commissioner, 273 F.2d 867 (2d Cir. 1959); J. George Gold, 41 T.C. 419, 427 (1963) (collecting cases).

The issues presented on appeal are (1) whether the findings of the district judge are sufficiently complete to sustain the judgment, (2) whether the taxpayer is entitled to deductions for payment of interest under Section 163 of the Internal Revenue Code of 1954, and (3) whether taxpayers are entitled in any event to deduct the actual economic loss sustained in the transactions in issue. We conclude that the findings below together with certain stipulated facts adequately support the judgment and that the district judge correctly held that the alleged loan transactions did not give rise to any indebtedness or payment of interest. We do not rule on taxpayers' third contention since it was not raised below.

I.

The claims of the taxpayers relate to two separate transactions. The taxpayers complain that the district judge failed to make any findings concerning the second transaction, and based all his findings on the stipulated facts without reference to the testimony adduced before him.

Although the district judge did not make findings of fact with regard to the second transaction, the facts stipulated by the parties indicate that the two transactions did not differ in any essential respect. On the view we take of the applicable legal principles, the stipulated facts are adequate to support the judgment for the Commissioner. Accordingly we hold that the taxpayers have not been prejudiced by any deficiency in the findings and that it is not necessary to remand for further findings. United States v. Kaplan, 267 F.2d 114 (2d Cir. 1959); Rossiter v. Vogel, 148 F.2d 292 (2d Cir. 1945); 5 Moore, Federal Practice ¶ 52.06[2] (2d ed. 1951).[2]

II.

The loan transactions for which interest deductions are claimed were planned and promoted by M. Eli Livingstone, a Boston broker and securities dealer, whose similar schemes for tax avoidance have had an extensive history of failure in the courts. See Lynch v. Commissioner, 273 F.2d 867 (2d Cir. 1959); Becker v. Commissioner, 277 F.2d 146 (2d Cir. 1960); Goodstein v. Commissioner, 267 F.2d 127 (1st Cir. 1959); Nichols v. Commissioner, 314 F.2d 337 (5th Cir. 1963); Lewis v. Commissioner, 328 F.2d 634 (7th Cir. 1964); Broome v. United States, 145 Ct.Cl. 298, 170 F.Supp. 613 (1959).

At Livingstone's suggestion, Perl, Jockmus' attorney, negotiated with Harry N. Cushing, President and Treasurer of Corporate Finance and Loan Corpora-

---

1. 26 U.S.C. § 163 (1958):
   "(a) General rule. There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."
   The taxpayer advanced as alternative contentions in the district court, claims that the expenditures were losses incurred in a transaction entered into for profit, 26 U.S.C. § 165(c) (2) (1958), or ordinary and necessary expenses paid or incurred for the production of income, 26 U.S.C. § 212 (1958).
   The alternatives have been abandoned on this appeal.

2. To remand for additional findings would only further delay litigation that has al-

ready consumed more time than seems reasonably necessary. Trial was held on July 24, 1961. A year later, on July 25, 1962, the trial judge entered an order stating his conclusion that the taxpayers were not entitled to a deduction for interest expenses and requesting the parties to submit proposed findings of fact and conclusions of law. Although the parties complied with that request in September and October, 1962, the district judge's final order, which consisted almost entirely of stipulated facts and the government's proposed conclusions of law, was not filed until July, 1963.

tion ("Corporate") and longtime friend and former law partner of Livingstone, an agreement for the loan of $973,750 at 4¼% interest to finance the purchase, at a price of 97⅜%, of $1,000,000 face amount 2⅞% United States Treasury Notes maturing March 15, 1957. The loan was to be given in exchange for Jockmus' note secured by the purchased securities.

As finally agreed upon, the note given Corporate by Jockmus differed from Corporate's usual form of note in four respects. A provision authorizing the lender to sell or hypothecate the borrower's pledged securities had been deleted, as well as a provision denying the borrower the right to prepay the loan and to receive a pro rata refund of prepaid interest. The borrower was made personally liable and the lender was given the right to call on the borrower for additional collateral. These departures are significant since it is largely to them that the taxpayers turn for their support of the proposition that the present scheme differs from those held insufficient in other cases.

On December 21 and 22, 1955, the following transactions took place. Perl, acting for Jockmus, ordered $1,000,000 in Treasury Notes from Lakeside Securities Corporation ("Lakeside"), Chicago, Illinois. Lakeside purchased the notes from Salomon Bros. & Hutzler, New York, New York, which delivered them to the Chemical Corn Exchange Bank in New York City, for Lakeside's account. Lakeside was directed by Jockmus to deliver the notes to Corporate in return for the $973,750 "loaned" by Corporate to Jockmus.

Meanwhile Corporate had directed Livingstone's brokerage firm, Livingstone & Co., to sell short $1,000,000 in Treasury Notes, delivery to be made on December 22, 1955. Such a short sale was executed, the purchaser being Salomon Bros. & Hutzler. To satisfy its delivery commitment on the short sale, Corporate instructed Lakeside to deliver to Livingstone & Co. the notes "purchased" by Jockmus, which Lakeside had been instructed to surrender to Corporate. In turn, Livingstone & Co. instructed Lakeside to deliver the notes to the order of Salomon Bros. & Hutzler at the Chemical Corn Exchange Bank.

Each "delivery" of the notes was conditioned, of course, on "payment" of the purchase price. What actually occurred, however, was that on December 22, 1955, Salomon Bros. & Hutzler, the original seller, delivered the notes at the Chemical Corn Exchange Bank, and Salomon Bros. & Hutzler, the ultimate purchaser, accepted redelivery of the same notes.[3] The intermediate steps in this circular transaction, other than the delivery to Corporate of Jockmus' promissory note, were accomplished by book entries. No notes and no money changed hands.

On December 21, 1955, arrangements were also made for the payment of "interest." In exchange for Jockmus' promissory note to Court Finance and Loan Corporation, Court issued to Jockmus a check for $30,000. Jockmus executed a check to Corporate for $41,384.38, Corporate's interest charges for one year, with instructions that $20,000 be applied as interest in 1955 and the balance of $21,384.38 be applied as interest in 1956.

3. See Perry A. Nichols, 37 T.C. 772, 788 n. 3, aff'd per curiam, 314 F.2d 337 (5th Cir. 1963):
"Although the parties stipulated that the Treasury notes purportedly here involved were transferred from the New York offices of the bond dealers, Salomon Bros. and Hutzler, to the account of Livingstone at the Chemical Corn Exchange Bank and back again to Salomon Bros. and Hutzler all on the same day, it is apparent from testimony elicited at the trial that the matching, simultaneous delivery and receipt instructions to the bond dealers and the bank cancelled each other so that the Treasury notes in fact never left the bond dealers' offices. * * * Of course, it makes little difference whether or not the Treasury notes were physically transferred to Livingstone's account for a few minutes or hours, as was true in the Goodstein case; in either case no Treasury notes or Government securities of any kind were in fact purchased by petitioners."

Finally also on December 21, 1955, Livingstone and Co. in return for a promise of payment of $1,250 on or before September 15, 1956, gave Jockmus an option to sell to them $1,000,000 in Treasury Notes.

On September 15, 1956, Jockmus sold the Treasury Notes to Livingstone & Co. pursuant to the option. The total sales proceeds, $1,006,250, were sufficient to pay the principal amount of the loans from Corporate and Court, interest of $784.58 due Court, and the $1,250 due Livingstone & Co. for the option, with a balance left over for Jockmus of $465.42.

Having previously sold the notes pledged with it by Jockmus, Corporate was required to cover its short position by purchasing $1,000,000 worth of notes. It executed such a purchase through Livingstone & Co., so that once again the transaction was circular in effect.

With regard to the identical procedure in the second transaction, Livingstone testified:

"Q. Do your records indicate whether there were actual bonds?

"A. There would be no actual bonds because when we have two matching orders we merely pair them off."

By repaying his indebtedness to Corporate before the expiration of the one year period for which interest had been paid, Jockmus was entitled, under the amended loan agreement, to a refund of $10,460.14. That sum was never directly returned to Jockmus. Taxpayers contend, however, and we accept that contention for the purposes of this opinion, that the $10,460.14 was applied as prepaid interest on the second loan transaction.

The second loan transaction took place on November 2, 1956, and involved the purchase of $2,000,000 face amount 2⅜% United States Treasury Bonds maturing June 15, 1958. Apart from differences in the amounts involved, the arrangements for the purchase of the bonds and the payment of interest were substantially identical with those in the first transaction, except that the record does not show whether Jockmus obtained a put option from Livingstone & Co. The bonds were held until maturity and then redeemed, the proceeds being applied to payment of principal, interest, and a fee to Livingstone. Jockmus paid a balance due of $600.84.

These were, then, the transactions on the basis of which the taxpayers claim that there were interest payments deductible as follows: $10,924.24 to Corporate on the first loan (the $21,384.38 credited in 1956 minus the $10,460.14 refund), $10,460.14 to Corporate on the second loan, and $784.58 to Court on the first loan.

1. *The interest payments to Corporate.* In Lynch v. Commissioner, supra, this court denied the taxpayers' claim that a transaction similar to that involved in the present case gave rise to a deductible interest expense. We concluded:

"that all the elaborate drawing of checks, execution of notes and bookkeeping entries performed by taxpayers, Livingstone and Gail [the finance corporation], did not in fact produce the legal transactions which they simulated. The deduction permitted by § 23(b) of the 1939 Code for 'all interest paid or accrued * * on indebtedness' is for the payment of 'compensation for the use or forbearance of money,' Deputy v. DuPont, 1940, 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416. Here no money was used or forborne."

273 F.2d at 871–872. Accord, Becker v. Commissioner, supra, 277 F.2d at 149; Goodstein v. Commissioner, supra, 267 F.2d at 131; Nichols v. Commissioner, supra, affirming 37 T.C. 772 (1962); Lewis v. Commissioner, supra; MacRae v. Commissioner, 294 F.2d 56, 58–59 (9th Cir. 1961), cert. denied 368 U.S. 955, 82 S.Ct. 398, 7 L.Ed.2d 388 (1962); Broome v. United States, supra.

Taxpayers argue that the cases cited above, and others like them, involved a

preconceived plan to enter into a sham transaction. The essence of those schemes, say the taxpayers, was that Livingstone or some other promoter was authorized to make all the arrangements required to consummate the transaction and the finance company was authorized to sell or hypothecate the pledged securities, as, in fact, it did. Accordingly the taxpayers would be deemed to have participated in the planning and implementation of the round robin.

Taxpayers claim that, on the contrary, the two loan transactions involved in the present case were arm's length business deals rather than preconceived plans to enter into a sham transaction. They point out that the provision giving Corporate the right to sell or hypothecate the pledged securities was deleted from Jockmus' promissory note.[4] Jockmus, they say, did not consent to the sale of the securities by Corporate and in fact Corporate's use of the securities to make a short sale was, they claim, an unlawful conversion under state law. They argue, moreover, that the transactions were not arranged entirely by Livingstone; the negotiations for the loans and details regarding the purchase of securities and payment of interest were handled for Jockmus by Perl. Taxpayers maintain that the indicia of a preconceived scheme are absent here, and that the transactions resulted in bona fide indebtedness.

▪▪ We hold that, for a transaction to be held sham within the meaning of the law of taxation, there is no requirement of showing the existence of a preconceived scheme on the part of the tax-

payer to enter into a sham transaction. The tax result depends on what actually transpired rather than what was intended. As we said in Lynch v. Commissioner, supra, 273 F.2d at 872:

"Save in those instances where the statute itself turns on intent, a matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of individual taxpayers."

Accord, Gheen v. Commissioner, 331 F.2d 470, 473 (6th Cir. 1964). See also Knetsch v. United States, 364 U.S. 361, 365–366, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960). That taxpayers may have relied on assurances that their collateral would not be sold affords no ground for relief. Nichols v. Commissioner, supra; Sammy Cahn, 41 T.C. 858 (1964), appeal pending (9th Cir.). If they have any remedy, it is against the alleged wrongful converters rather than the Commissioner. Sammy Cahn, supra.

Despite taxpayers' protestations that Corporate's sale of the pledged securities did not extinguish Jockmus' personal liability on the promissory note, we must conclude that no actual indebtedness was created. In ordinary business transactions, the creation of an indebtedness requires the concurrence of the parties. Corporate's actions make clear that it, at least, did not envisage the creation of a bona fide indebtedness. Moreover, since the proceeds Corporate realized from the short sale of the Treasury Notes exceeded the face amount of Jockmus' note, Jockmus could never be called upon to make any additional payment on

4. Although we assume for purposes of this opinion that Jockmus did not authorize Corporate to sell the pledged securities, we note that there was evidence in the record which would have permitted a contrary inference. Thus Cushing, a lawyer, testified that he had been given no formal or informal permission to make a short sale of the pledged securities but nevertheless stated that he considered he had the right to sell short. After repeated questioning Perl would say only that he had told Cushing that Jockmus did not want him to deal in the collateral. Moreover, Corporate had no funds of its own

with which to make the loan, and it was required, as Cushing admitted, either to make a short sale or to borrow from banks by repledging the security, which under taxpayers' construction of the loan agreement would also have been an unlawful conversion. The district judge might well have concluded that, assuming that Perl made the minimal investigation one would expect from a person of his experience, "it would strain credulity to the breaking point to suppose that taxpayers had no inkling that something highly unusual was going on." Lynch v. Commissioner, supra, 273 F.2d at 872.

the purported indebtedness. No funds were in fact advanced by Corporate; the intricate manipulations cancelled each other out completely. In actual effect, what Jockmus obtained was, as in Lynch v. Commissioner, supra, not a loan at all, but merely a contractual right to delivery of the securities in the future upon payment of an agreed price, the amount of the so-called loan.

2. *The interest payment to Court.* Taxpayers contend that the transaction with Court stands on a different footing since Jockmus gave Court an unsecured promissory note on which he was personally liable. They assert that "this obligation was at all times fully enforceable by Court. It was not contingent in any way upon the performance by Corporate or Livingstone."

Taxpayers would have us judge the consequences of Jockmus' dealings with Court as if they constituted a completely independent transaction. But in transactions of this kind it is normally true that the separate steps, taken individually, may be in accord with accepted business practices. "What we must decide is not whether the individual steps necessary to establish a formalistic debtor-creditor relationship were undertaken but whether, when the transaction is considered as a whole and realistically, there was in substance a debtor-creditor relationship." Rubin v. United States, 304 F.2d 766, 769 (7th Cir. 1962).

In the present case the stipulated facts permit only one conclusion, that the $30,000 "loan" made by Court was an integral part of the transaction with Corporate. The $30,000 advanced by Court went in and out of Jockmus' bank account almost simultaneously. Its sole function was to reduce Jockmus' cash outlay in the deal. When the transaction was wound up the proceeds sufficed to cover all of Jockmus' paper obligations, including the $30,000 plus interest due Court, and this result was guaranteed to Jockmus, without risk, by the put option he had obtained from Livingstone & Co. Payment of the $30,000 and interest was thus only an accounting entry having no greater reality than the transaction as a whole. In sum, the device of having a subsidiary loan made by Court, which was also used in the transaction held a sham in Broome v. United States, supra, is simply an immaterial variation on the principal theme. Compare Goodstein v. Commissioner, supra, 267 F.2d at 130 (after payment of interest, finance company reloaned same amount to taxpayer); Morris R. DeWoskin, 35 T.C. 356, 359–360 (same); Danny Kaye, 33 T.C. 511, 531–532 (1959), aff'd per curiam, 287 F.2d 40 (9th Cir. 1961) (original loan in excess of purchase cost of pledged securities served to defray interest expenses); Egbert J. Miles, 31 T.C. 1001 (1959) (same); Lynch v. Commissioner, supra, 273 F.2d at 869, 870 (part of funds for interest payment advanced by Livingstone as a non-interest bearing loan); Perry A. Nichols, 37 T.C. 772, 778 (1962), aff'd per curiam, 314 F.2d 337 (5th Cir. 1963) (same). "The choice of the more complicated and involved method of doing nothing had no purpose, save the erection of the facade upon which petitioners now seek to rely." Rubin v. United States, supra, 304 F.2d at 770.

We hold that the $784.58 allegedly paid to Court when the accounts for the first transaction were settled is not deductible as interest paid on an indebtedness.

### III.

In the first loan transaction Jockmus sustained an out-of-pocket loss of $458.82—his actual cash outlay ($11,384.38), less the cash returned on settlement of the first transaction ($465.42) and the refund of prepaid interest ($10,460.14). Taxpayers contend that, if a deduction is not allowed for the interest payments, they were entitled in 1956 to an ordinary deduction for the actual economic loss sustained by Jockmus as a loss incurred in a transaction entered into for profit. 26 U.S.C. § 165(c) (2) (1958).

In Becker v. Commissioner, supra, this court noted that the practical result of these sham transactions is that the taxpayer obtains a contractual right to fu-

ture delivery of securities upon payment of the principal amount of the putative loan. Characterizing that right as an "option," we held that the taxpayer's out-of-pocket loss was attributable to the failure to exercise an option and was therefore deductible as a short-term capital loss under Section 117(g) (2) of the 1939 Code [present § 1234(a)] whether or not the transaction had been entered into with a profit motive. Accord, Mac-Rae v. Commissioner, supra, 294 F.2d at 59–60; Lynch v. Commissioner, supra, 273 F.2d at 872–873 (dictum); Goodstein v. Commissioner, supra, 267 F.2d at 132 (dictum); contra, Lewis v. Commissioner, supra, 328 F.2d at 639–640 (such transactions, being a sham in their entirety, do not create an option); Morris R. DeWoskin, supra, 35 T.C. at 362–364 (losses are not deductible under § 1234(a) unless they are allowable under § 165(c)). Pursuant to the Becker decision, the judgment entered below, which was in effect a stipulated judgment on a separate count of the complaint not in issue on appeal, 222 F.Supp. at 789 n. 3, allowed taxpayers a short-term capital loss for Jockmus' out-of-pocket loss. Neither taxpayers' complaint nor the record indicates that taxpayers presented to the district court the issue they now seek to raise on appeal.

Taxpayers attempt to distinguish Becker on the ground that Jockmus did not intend to acquire an option and that therefore his loss is not attributable to failure to exercise an option. Even if we should accept that argument, the taxpayers would still be required to show that the transaction was entered into for profit. Conceding that the district judge did not pass on that question—which was not necessary for a proper disposition of the claim concerning interest expenses, see Knetsch v. United States, supra, 364 U.S. at 365, 81 S.Ct. 132—taxpayers rely on Jockmus' "undisputed testimony" that his purpose was to make a profit by speculating on an upturn in the bond market.

Had he made a finding on this issue, the district judge might have discredited Jockmus' testimony. From an evaluation of the transaction as a whole the district judge might have concluded that there was a preconceived scheme to implement a sham transaction, see note 4 supra, and that the only motive Jockmus had was a tax motive. We of course cannot determine this crucial factual question on appeal. Nor do we think this is one of those exceptional cases in which a party should be permitted to raise a question for the first time before an appellate court and have the case remanded for further findings of fact on that issue. See Hormel v. Helvering, 312 U.S. 552, 556–559, 61 S.Ct. 719, 85 L.Ed. 1037 (1941). Compare MacRae v. Commissioner, supra, 294 F.2d at 59 (new contention regarding out-of-pocket loss would be considered on appeal where no new fact issues were presented).

As we do not pass on the taxpayers' contention and the United States did not appeal from the judgment, we do not consider the government's suggestion that we should overrule Becker and adopt the position taken in the Lewis and DeWoskin decisions.

Judgment affirmed.