MALDEN KNITTING MILLS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 86865. Filed July 24, 1964.

*Kenneth W. Bergen* and *Josiah A. Spaulding*, for the petitioner.
*Robert B. Dugan* and *Albert R. Doyle*, for the respondent.

**OPINION**

Raum, *Judge:* 1. We have found as a fact that Malden's "purchase" and "resale" of the 3,000 shares of Railway stock were merely component parts of a sham. Although there was testimony calculated to

lead us to the conclusion that Malden made a bona fide purchase of such shares, we did not believe it. We heard and observed both Feuerstein and Keizer, and the short answer to petitioner's position is that we had no confidence in their testimony in this respect.

It must be remembered that Malden's "purchase" and "resale" of 3,000 shares of Railway stock were parts of a larger picture involving four other clients of Glunts who entered into like transactions. All five of these clients, including Malden, purported to purchase an aggregate of 20,370 shares of Railway stock on February 14, 1955, from Keizer & Co. at the identical price of 52, and all five purported to resell their respective shares to Keizer & Co. at the identical price of 46⅛ on the very next day when the stock went ex dividend. The 20,370 shares which Keizer & Co. purported to sell to these five clients of Glunts on February 14 were substantially in excess of the total number of shares of that stock that were traded on that day on the New York Stock Exchange, and Keizer & Co. had no such stock in its inventory.[2] We do not believe that Keizer & Co. ever intended to make delivery of the shares it purported to sell, or that it contemplated anything other than a bookkeeping reversal of these sales by means of purported repurchases when the stock went ex dividend. The fact that all five of Glunts' clients, including Malden, promptly "resold" their shares to Keizer & Co. speaks too loudly to be ignored in the context of the record before us.[3] We are satisfied that Malden did not make any bona fide purchase of Railway stock on February 14, that it did not sell any Railway stock on February 15, that it suffered no short-term capital loss on the transaction, that it received no dividend in connection with that transaction entitling it to a deduction in the amount of 85 percent thereof, and that indeed no part of any

[2] The parties have stipulated that at the time of the "sale" to Malden, Keizer did not have any such stock "in its inventory and it did not thereafter acquire any such stock for delivery to petitioner." There was some testimony to the effect that although Keizer & Co. was "short" to the extent of the 20,370 shares it purported to sell, it was "long" to the extent of some 5,250 shares that it had bought on that day. However, the evidence further indicates that those 5,250 shares were purportedly purchased from four other clients of Glunts on Feb. 14, and that there were four matching sales by Keizer & Co. in the identical number of shares to four charities on the following day. In view of the fact that there is other evidence before us revealing that one of the variations of Glunts' tax-avoidance device involved the use of charities, we cannot find on the basis of the foregoing skeleton outline that Keizer & Co. in fact had made any bona fide purchases aggregating 5,250 shares or that it was in fact "long" to that extent.

[3] Moreover, although Keizer & Co.'s purported sales of the 20,370 shares and purported purchase of the 5,250 shares on Feb. 14, referred to in fn. 2, *supra*, were at a price of 52, its purported repurchases of the 20,370 shares on Feb. 15 were at a price of 46⅛ (within the range of prices for that day on the New York Stock Exchange) while its purported resales of the 5,250 shares on Feb. 15 were at a price of 47⅞ in respect of 3,250 shares and at a price of 47⅛ in respect of 2,000 shares (both prices outside the range of prices for that day on the New York Stock Exchange). It will be seen that, after taking into account the adjustment for the $5 dividend, Keizer & Co.'s profit on each of the transactions, except the sale of 2,000 shares to one of the charities at a price of 47⅛, was exactly ⅞ per share. We do not believe that this was sheer coincidence but are convinced that it was the result of a plan or plans that had been prearranged with Keizer.

such alleged dividend should have been included in its gross income in the first instance.

The situation before us is somewhat comparable to *Empire Press, Inc.*, 35 T.C. 136, which involved another variation of Glunts' basic device and which was similarly executed for the taxpayer therein by Keizer & Co. The result that we reach here is in accord with what we recently referred to in *J. George Gold*, 41 T.C. 419, 427, and *Sammy Cahn*, 41 T.C. 858, 874, as "an ever lengthening line of decisions reaching like results in a variety of situations comparable to the one before us." *Eli D. Goodstein*, 30 T.C. 1178, affirmed 267 F. 2d 127 (C.A. 1); *Broome* v. *United States*, 170 F. Supp. 613 (Ct. Cl.); *Sonnabend* v. *Commissioner*, 267 F. 2d 319 (C.A. 1), affirming per curiam a Memorandum Opinion of this Court; *Lynch* v. *Commissioner*, 273 F. 2d 867 (C.A. 2), affirming 31 T.C. 990 and *Leslie Julian*, 31 T.C. 998; *Egbert J. Miles*, 31 T.C. 1001; *Jockmus* v. *United States*, 335 F. 2d 23 (C.A. 2); *Becker* v. *Commissioner*, 227 F. 2d 146 (C.A. 2), affirming a Memorandum Opinion of this Court; *Gheen* v. *Commissioner*, 331 F. 2d 470 (C.A. 6); *Rubin* v. *United States*, 304 F. 2d 766 (C.A. 7); *Lewis* v. *Commissioner*, 328 F. 2d 634 (C.A. 7), affirming a Memorandum Opinion of this Court; *Morris R. DeWoskin*, 35 T.C. 356, appeal dismissed (C.A. 7); *Perry A. Nichols*, 37 T.C. 772, affirmed 314 F. 2d 337 (C.A. 5); *MacRae* v. *Commissioner*, 294 F. 2d 56 (C.A. 9), affirming in part and remanding in part 34 T.C. 20, certiorari denied 368 U.S. 955; *Kaye* v. *Commissioner*, 287 F. 2d 40 (C.A. 9), affirming per curiam 33 T.C. 511; *Milton Hart*, 41 T.C. 131; *Carl Shapiro*, 40 T.C. 34; cf. *Knetsch* v. *United States*, 364 U.S. 361; *Amor F. Pierce*, 37 T.C. 1039, affirmed 311 F. 2d 894 (C.A. 9); *A. A. Helwig*, 37 T.C. 1046; *United States* v. *Roderick*, 290 F. 2d 823 (C.A. 5); *Bridges* v. *Commissioner*, 325 F. 2d 180 (C.A. 4), affirming 39 T.C. 1064; *Weller* v. *Commissioner*, 270 F. 2d 294 (C.A. 3), affirming 31 T.C. 33 and *W. Stuart Emmons*, 31 T.C. 26, certiorari denied 364 U.S. 908; *William R. Lovett*, 37 T.C. 317.

Petitioner's "purchase" and "resale" of 3,000 phantom shares of Railway stock consisted in substance of nothing more than a bucket-shop-type transaction.[4] Although it argues earnestly that, whatever

---

[4] Mass. Gen. Laws ch. 271, sec. 35, defines "Bucketing" or "Bucket-shopping" as follows: SEC. 35. "BUCKETING" OR "BUCKET-SHOPPING."

(a) The making of, or offering to make, any contract respecting the purchase or sale, either upon credit or upon margin, of any securities or commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange upon which said securities or commodities are dealt in, and without a bona fide purchase or sale of the same; or

(b) The making of, or offering to make, any contract respecting the purchase or sale, either upon credit or upon margin, of any securities or commodities, wherein both parties intend, or such keeper intends, that such contract shall be, or may be, deemed terminated, closed or settled, when such public market quotations of prices for the securities or com-

may have been Keizer's intentions, Feuerstein intended to make a bona fide purchase in its behalf, we do not take so generous a view of Feuerstein's intentions. We think that he fully understood that he was entering into a transaction that was to be promptly reversed without any delivery of securities. Moreover, even if his testimony were to be accepted at face, a taxpayer's possible good faith cannot change the nature of what is otherwise a sham transaction. See *Bornstein v. Commissioner*, 334 F. 2d 779 (C.A. 1), affirming a Memorandum Opinion of this Court; *Jockmus v. United States, supra; Lynch v. Commissioner*, 273 F. 2d 867, 872 (C.A. 2); *Gheen v. Commissioner, supra; Perry A. Nichols*, 37 T.C. 772, 788–789, affirmed 314 F. 2d 337, 338 (C.A. 5); *MacRae v. Commissioner*, 294 F. 2d 56, 59 (C.A. 9), certiorari denied 368 U.S. 955. Cf. *Sammy Cahn*, 41 T.C. 858, 875, fn. 4.

We do not express any opinion as to whether petitioner would have become entitled to the tax benefits it seeks if it had actually purchased Railway stock dividend on and then sold it ex dividend, all in accord with a preexisting plan.[5] We cannot find on the record before us that it ever purchased any Railway stock, or that Keizer & Co. ever made a bona fide short sale of such stock to petitioner.[6] It is one thing to make a genuine short sale, intending to effect delivery thereafter; it is quite another thing to go through the form of executing a short sale without intending to make delivery. The burden of proof was upon the petitioner, and the testimony offered by it to carry that burden did not ring true.

2. Petitioner contends alternatively that if the first issue should be decided against it, as was done above, it is nevertheless entitled to deduct its "out-of-pocket expenses" in the amount of $2,805. Actu-

---

modities named in such contract shall reach a certain figure without a bona fide purchase or sale of the same ; or

(c) ,The making of, or offering to make, any contract respecting the purchase or sale, either upon credit or upon margin, of any securities or commodities, wherein both parties do not intend, or such keeper does not intend, the actual or bona fide receipt or delivery of such securities or commodities, but do intend, or such keeper does intend, a settlement of such contract based upon the differences in such public market quotations or prices at which said securities or commodities are, or are asserted to be, bought and sold.

Sec. 36 provides :

SEC. 36. PENALTY FOR KEEPING A BUCKET SHOP, AND JURISDICTION TO DISSOLVE SUCH CORPORATION.

Whoever makes, or offers to make, any contract of bucketing or bucket-shopping, or who is the keeper of any bucket shop, shall be punished by a fine of not more than one thousand dollars or by imprisonment for not more than one year. Whoever shall be convicted of a second offence shall be punished by imprisonment for not more than five years. * * *

[5] To the extent that there are actual purchases and sales, the tax advantages sought by petitioner would be defeated for tax years after 1957 by sec. 18 of the Technical Amendments Act of 1958, adding sec. 246(c) to the 1954 Code. These provisions, however, did not impart validity to sham transactions in prior years. Cf. *Knetsch v. United States*, 364 U.S. 361, 367–369.

[6] *Fabreeka Products Co. v. Commissioner*, 294 F. 2d 876 (C.A. 1), relied upon by petitioner, is therefore not in point, because the court regarded the taxpayers before it as having "made actual 'investments.' " (p. 878.)

ally, petitioner did not make any specific expenditure in that amount. That figure reflects its net loss on the transaction and represents the difference between the $93,600 which petitioner paid Keizer & Co. as part of the purported purchase price for the 3,000 shares of Railway stock and the sum of the two amounts which it received from Keizer & Co., namely, $75,795 as the balance in its account upon the alleged resale of those shares and $15,000 as a "dividend" thereon.

Petitioner seeks the $2,805 deduction on either of two grounds: (i) As a short-term capital loss upon the sale of an "option" under sections 1234(a) [7] and 165 [8] of the 1954 Code, or (ii) as an "ordinary and necessary" business expense under section 162(a).[9] We hold that the claimed deduction is not allowable under any of those provisions.

(i) Petitioner argues that it could have demanded delivery from Keizer & Co. of 3,000 shares of Railway stock "upon payment of $62,400, the 'exercise price,'" that on February 15, 1955, it "sold the option to Keizer & Co. * * * and suffered a loss," and that such loss upon the "sale of the option" was deductible under sections 1234(a) and 165. Its position in this respect rests upon pure fiction and a strained interpretation of the term "option."

Petitioner did not hold any "option" as that term is ordinarily understood, and it confuses the difference between an option and what purports to be an executed contract of sale. See *Lawler* v. *Commissioner*, 78 F. 2d 567, 568 (C.A. 9). Pursuant to its arrangement with Keizer & Co., petitioner purported to make an outright purchase of 3,000 shares of Railway stock and then purported to make an outright resale of these shares on the following day. No "option" of any kind was involved, and it would require a judicial tour de force to press this case into the mold of section 1234. The inapplicability of the option loss provisions in situations of this kind was fully spelled out in *Morris R. DeWoskin*, 35 T.C. 356, appeal dismissed (C.A. 7), dealing with the corresponding provisions in section 117(g)(2) of the

---

[7] SEC. 1234. OPTIONS TO BUY OR SELL.

(a) TREATMENT OF GAIN OR LOSS.—Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).

[8] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\*       \*       \*       \*       \*       \*       \*

(f) CAPITAL LOSSES.—Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212.

[9] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

1939 Code. And the Court of Appeals for the Seventh Circuit recently reached the same result in *Lewis* v. *Commissioner*, 328 F. 2d 634. We follow *DeWoskin* and *Lewis* here.

The dictum in *Goodstein* v. *Commissioner*, 267 F. 2d 127, 132 (C.A. 1), relied upon by petitioner, was plainly not concerned with the foregoing considerations. Moreover, *Goodstein* and the two other cases relied upon by petitioner in respect of this issue (*Becker* v. *Commissioner*, 277 F. 2d 146 (C.A. 2) ; *MacRae* v. *Commissioner*, 294 F. 2d 56 (C.A. 9)) are distinguishable here. In *Goodstein* (pp. 131, 132), the court found that the taxpayer promised to pay Seaboard $9,929,-212.71 at any time he might select and that Seaboard promised to acquire and deliver to the taxpayer, on the date he selects, certain Treasury notes in the face amount of $10 million. Both *Becker* (p. 148) and *MacRae* (p. 60) found similar promises on the part of the taxpayer and the purported lender, respectively. There is thus a crucial distinction between the instant case and the three cases relied on by petitioner.[10] Here we have found that it was the understanding and intention of the parties that Keizer & Co. was not to deliver any Railway stock. Petitioner promised to pay $156,000 to Keizer & Co. and Keizer & Co. promised to pay to petitioner $15,000 (the purported dividends on the Railway stock) plus $138,195, which amount represented the selling price of the stock ex dividend, namely, $138,375, less a charge in the amount of $180 for tax on the purported sale. Keizer & Co.'s promise was to pay money in a bucket-shop-type transaction and not to deliver stock. Simply stated, petitioner incurred a loss because it received less money than it paid out, and the money it received in no way related to any right to require delivery of Railway stock. There was no option to purchase "property" within the meaning of section 1234.

(ii) Nor is the claimed deduction of $2,805 allowable under section 162(a) as an ordinary and necessary business expense. Petitioner contends, and it is supported by evidence, that it from time to time made short-term investments in securities with funds temporarily not needed in its manufacturing business, that such investment activities were part of its business, and that therefore investment expenses thus incurred are deductible as business expenses. The difficulty with that contention here is that petitioner did not in fact make any bona fide investment in securities in respect of the alleged purchase of 3,000 shares of Railway stock, short term or otherwise, and that in accordance with our finding this transaction was a sham. Any loss which it sustained in connection therewith was not an "ordinary and

---

[10] Moreover, in *Jockmus* v. *United States*, 335 F. 2d 23 (C.A. 2), the court carefully avoided the question whether it should overrule its earlier decisions in *Becker* in the light of *Lewis* and *DeWoskin*.

necessary" expense incurred "in carrying on * * * [its] trade or business." Cf. *Carl Shapiro*, 40 T.C. 34, 39–40; *MacRae* v. *Commissioner*, 294 F. 2d 56, 59 (C.A. 9).

Furthermore, in view of the intention of the parties not to make delivery of the securities in which they purportedly dealt, there appears to have been a violation of the Massachusetts law against bucketshop transactions. See fn. 4, *supra*. Accordingly, there may be serious doubt whether losses incurred in any such transaction, in contravention of the clearly defined public policy of the State, are in any event deductible by reason of that circumstance alone. Cf. *Tank Truck Rentals* v. *Commissioner*, 356 U.S. 30; *Lilly* v. *Commissioner*, 343 U.S. 90, 97.

*Decision will be entered under Rule 50.*