**Amelia J. TAYLOR, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

**No. 235, Docket 24823.**

United States Court of Appeals
Second Circuit.

Argued Feb. 13, 1958.

Decided July 14, 1958.

Boris Kostelanetz, New York City (Brozan & Holman, New York City, on the brief), for petitioner.

George W. Beatty, Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and Melva M. Graney, Department of Justice, Washington, D. C., on the brief), for respondent.

Before HINCKS and LUMBARD, Circuit Judges, and DIMOCK, District Judge.

LUMBARD, Circuit Judge.

Petitioner seeks review of a determination by the Tax Court of a $101,-694.83 deficiency in her income tax for the calendar year 1947. She contends that the Tax Court erred in taxing her on the profits in 1947 from commodity trading accounts which she maintained in the names of three relatives, and, in the alternative, it should have permitted a credit for taxes paid by two of the relatives on the same profits.

Petitioner, on the death of her husband in 1945, received his entire estate as his sole distributee and thereafter became an active and successful trader on the commodity exchange. Both before and after her husband's death Mrs. Taylor had enjoyed a warm, close relationship with three of his relatives; a nephew, William L. Newcombe of Boston, Mass.; William's wife Pauline; and a niece, Roberta Taylor, a Canadian citizen then residing in Freetown, Prince Edward Island. All three were in modest circumstances, and Mrs. Taylor, in 1946, was moved by generous impulses to establish commodity accounts in each of their names.

Accordingly, after consulting with William, Pauline and Roberta and obtaining their permission to do so, petitioner opened the trading accounts with a New York brokerage house. Coincident with the opening the nieces and nephew executed revocable powers of attorney and indemnity agreements, and filed them with the brokers, designating petitioner as their agent with unrestricted control over the conduct of the accounts. All sums invested in the accounts were furnished by petitioner, and through 1948 she continued in complete control. During this period she actively traded through the accounts without consulting with or advising Roberta or the Newcombes of the transactions, although the brokerage house sent out periodic statements to those named as owners.

During this trading Mrs. Taylor deposited $73,600 of her own funds in the accounts. This was offset by sporadic withdrawals of capital and of profits, so that at any one time the total investment generally ranged below $22,000. One of her deposits was for $10,000 in Pauline's account in 1947. After William heard of the deposit he insisted that he and his wife should give protection for such a large sum. Accordingly, Pauline executed a 4% demand note for that amount. Similar demand notes were executed for subsequent deposits of $10,000 and $1,500 in William's account. The first quarter's interest of $100 on Pauline's note was paid on August 26, 1947; Pauline reported it as a deduction and Mrs. Taylor as income. No other interest or principal payments were made, and petitioner at the hearing below stated that she expected payment only if there were profits sufficient for the purpose.

In 1946 William received 200 shares of Allegheny Corporation common stock which had been purchased with funds from his trading account. He still holds this stock in his own name. The only other disbursement to any of the relatives occurred when William and Pauline filed their tax returns for 1947 (Roberta, a Canadian resident and citizen, did not file a return). At that time the Newcombes declared the 1947 profits as their income and received, on request, checks from their accounts to cover the consequent increase in their federal and Massachusetts tax obligations. This

was not done in 1946, when Mrs. Taylor, and not the Newcombes, declared the profits and paid the resulting federal tax.

A drastic drop in commodity prices in 1948 wiped out the previous large profits, and when the accounts were wound up that year Mrs. Taylor was unable to recover from the aggregate accounts almost $6,000 of the funds she had deposited in them. This loss, however, was not attributable to all three accounts. The petitioner recovered $10,200 more from Roberta's account than she had ever deposited in it, but her recovery from the Newcombe accounts was about $16,000 less than her total deposits in them. There is nothing in the record to show that since 1948 Mrs. Taylor has paid anything over to Roberta or received payment from the Newcombes.

■■ The Tax Court found in the totality of circumstances that petitioner was the owner of the accounts for tax purposes and that it was to her that the income was attributable. In its view, the accounts represented intended gifts, the intention being frustrated by subsequent events. Petitioner, in attacking this finding, points out that a taxpayer who in good faith purchases investment property for another with his own funds is not chargeable with the income merely because he manages the property as an agent.[1] We have no quarrel with this general proposition. The Tax Court found, however, on the basis of substantial evidence that there had been no transfer of ownership.[2]

There is no suggestion here that petitioner's arrangements were motivated by tax considerations. Indeed, we think it clear that her actions were the product of generous impulses. Further, there is some evidence which suggests that the advances to the accounts were bona fide loans or gifts to the Newcombes and Roberta and that they in fact owned the accounts. The revocable powers of attorney and indemnity agreements, William's receipt of the Allegheny Corporation stock, the tax treatment in 1947, the execution of the demand notes and payment of interest, and much of the testimony supports this view. Petitioner contends that the only evidence to the contrary and that upon which the Tax Court predicated its decision was some equivocal testimony by Mrs. Taylor that she intended to build up the accounts to $100,000 before turning them over to the nominal owners,[3] and that in view of the other circumstances a con-

1. See e. g. Henson v. Commissioner, 5 Cir., 1949, 174 F.2d 846; Kent v. Commissioner, 6 Cir., 1948, 170 F.2d 131; Visintainer v. Commissioner, 10 Cir., 1951, 187 F.2d 519, certiorari denied 342 U.S. 858, 72 S.Ct. 85, 96 L.Ed. 646.

2. Because of our agreement with the Tax Court that the accounts were intended gifts only, it is unnecessary to discuss those cases where a transfer is in fact made within a family but the transferor retains such extensive control that there is but a paper reallocation of income within the family group. See e. g. Commissioner of Internal Revenue v. Culbertson, 1949, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659; Commissioner of Internal Revenue v. Sunnen, 1948, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898; Pleason v. Commissioner, 7 Cir., 1955, 226 F.2d 732, certiorari denied 350 U.S. 1006, 76 S.Ct. 650, 100 L.Ed. 868.

3. On cross-examination, taxpayer testified as follows:
"Q. Mrs. Taylor, in view of that rather large amount of standing to the good as of the end of 1947, what were your plans as to when you would turn over some of the profits? A. Didn't you ever try to build something up to $100,000? Didn't anyone else in the market ever try to do that?
"Q. I never did it, Mrs. Taylor. But was that your plan? A. It was my plan indirectly, yes, to try to build it up to $100,000, if I could.
"Q. When you had a credit balance of $100,000 in the account, was it your plan then to turn it over to the Newcombes and Roberta Taylor? A. Yes, definitely.
"Q. Until that time, though, you had not planned on turning it over? A. That was in the back of my mind. That is what I wanted to do. You asked me why I didn't do anything before that. That was my plan."

clusion based solely on this testimony cannot stand.

■ The conclusion that the accounts were intended gifts rather than the depositories of loans or completed gifts is sustained, however, by far more than this testimony. The "loans" were to be repaid only if the venture prospered and only one interest payment was made by the Newcombes. Roberta never executed any notes. Although the Newcombes included the profits in their 1947 returns, the previous year petitioner had paid the tax and neither William nor Pauline had included the income and neither requested information as to the proper tax treatment. Throughout the life of the accounts petitioner made unrestricted deposits and withdrawals of both capital and income without advising the nominal owners, and when the accounts were closed out in 1948 she absorbed both the losses in the Newcombe accounts and the profit in the Roberta account. No adjustment has ever been made. We think the Tax Court properly concluded that petitioner used her funds to produce income which, if the venture was successful, she intended to turn over to her relatives at some future time and that in the interim she exercised full control over the accounts and treated them as her own. Consequently, the investment property remained for all purposes that of petitioner. See Johnson v. Commissioner, 2 Cir., 1936, 86 F.2d 710; Beaver v. Beaver, 1889, 117 N.Y. 421, 428–429, 22 N.E. 940; Mazza v. Cillis, 1944, 267 App.Div. 266, 45 N.Y.S.2d 417. Since income is taxable to him who owns the property which produces it, see Helvering v. Horst, 1940, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75; Lucas v. Earl, 1930, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, the profits are taxable to petitioner. Indeed, the income, except for the Allegheny Corporation stock and the 1947 tax checks, never was disposed of to the relatives.

In holding that the profits are attributable to petitioner, the Tax Court further concluded that she was not within the ameliorating provisions of § 3801 of the 1939 Code, now §§ 1311–1314 of the 1954 Code,[4] and thus was not entitled to credit for the 1947 tax payments by the Newcombes. These sections provide relief, by way of a credit or refund, from double taxing arising from taxing the same transaction in different years or to different taxpayers. However, the relief which the petitioner invokes under these sections is limited to situations involving tax payments made by "related taxpayers." And the Tax Court held that neither the Newcombes nor Roberta stood to the petitioner as "related taxpayers" within the express definition of § 1313(c). On that account it denied the petitioner's claimed credit.

■ We do not pass upon the merits of that holding because we think the Tax Court was without jurisdiction to grant or deny this relief. The related taxpayer provisions permit relief only after a "determination" as statutorily defined, which includes "a decision by the Tax Court * * * which has become final." 26 U.S.C.A. § 1313(a) (1). A decision of the Tax Court does not become final until the means of appellate review have been exhausted or barred by the passage of time. 26 U.S. C.A. § 7481.[5] Wiener Machinery Co. v. Commissioner, 1951, 16 T.C. 48, 54.

■ Here the taxes were paid by the Newcombes from funds which we have concluded were provided by petitioner. If they are unable to recover their payments under the related taxpayer pro-

4. The applicable provisions are those of the 1954 Code. 26 U.S.C.A. § 1315(a). The change has no substantive significance here.

5. This section provides, *inter alia:* "The decision of the Tax Court shall become final—(1) Timely petition for review not filed.—Upon the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time; or (2) Decision affirmed or petition for review dismissed. * * *"

visions, we would be faced with a situation where the government would collect twice because of a good faith mistake in allocating the tax liabilities of particular transactions. If statute or equitable doctrines permitted us to allow a credit to petitioner, we would do so. Unfortunately, no credit can be permitted.

■■ It is common ground that the jurisdiction of the Tax Court is purely statutory and that it does not have general equitable jurisdiction. Commissioner of Internal Revenue v. Gooch Milling & Electric Co., 1943, 320 U.S. 418, 64 S.Ct. 184, 88 L.Ed. 139; Babcock & Wilcox Co. v. Pedrick, 2 Cir., 1954, 212 F.2d 645, 648, 652, certiorari denied 348 U.S. 936, 75 S.Ct. 355, 99 L.Ed. 733. Nor is this Court empowered to take any action prohibited to the Tax Court. Our function is one of review. See Vandenberge v. Commissioner, 5 Cir., 1945, 147 F.2d 167, certiorari denied 325 U.S. 875, 65 S.Ct. 1556, 89 L.Ed. 1993.

It is suggested, however, that the Tax Court has jurisdiction to determine the net deficiency for the year and that the taxes paid by the Newcombes are in effect a tax paid by petitioner which reduces the net deficiency. The fact remains, however, that the tax was paid by the Newcombes, even though with funds provided by petitioner. A credit to petitioner would necessarily require a collateral determination of the substantive rights between petitioner and the Newcombes as to the 1947 tax funds, a determination which would not bind the Newcombes nor prevent their seeking a refund. We think the scope of the inquiry cannot be broadened by labelling the Newcombe payments as payments by petitioner. See Meyers v. Commissioner, 1953, 21 T.C. 331, 347; Masterson v. Commissioner, 1942, 1 T.C. 315, 328. The related taxpayers provisions, providing a means of redress, although limited, is implicit recognition of the lack of jurisdiction in the Tax Court to adjudicate such credits.

Affirmed.

DIMOCK, District Judge (dissenting in part).

I concur except that I would direct that the payments which accompanied the Newcombes' income tax returns be set off against petitioner's liability. A necessary part of the decision that the income was petitioner's is that the brokerage accounts which earned it were petitioner's. The payments which accompanied the Newcombes' income tax returns went direct from those brokerage accounts to the United States Treasury. The Government is saying with one breath "the brokerage accounts were petitioner's" and with the next "the money which went direct from those brokerage accounts to the Treasury was the Newcombes'." Unlike the cases of Meyers v. Commissioner, 21 T.C. 331, and Masterson v. Commissioner, 1 T.C. 315, cited in the majority opinion, no question of reducing A's liability by B's payment is involved. The liability here was petitioner's and the payments were petitioner's. The Tax Court needs no equitable jurisdiction to determine the debits and credits in an account with a single taxpayer. In spite of the use of the Newcombes' names petitioner should be given credit for the payments. Bailey v. United States, 104 F.Supp. 997, 122 Ct.Cl. 552.

The related taxpayer provisions, 26 U.S.C. §§ 1311–1314, were required to deal with the case where the liability was A's but a tax had been paid by B. They would be important here only if the Newcombes had actually paid petitioner's tax.

It is said that a determination that the payments were made by petitioner would not bind the Newcombes. Even so, that would not affect the Tax Court's jurisdiction to make the determination as between the Government and petitioner. From a practical standpoint the objection is just as insubstantial. If the Newcombes sought refund of the payments in some proceeding, the Government would be no more bound by our determination that the assessments ought to have been against petitioner

than the Newcombes would be bound by my proposed determination that the payment ought to be set off against petitioner's liability. The burden would be upon the Newcombes to prove that the assessments ought to have been against petitioner. That could not be proved, however, without proving petitioner's ownership of the brokerage accounts and consequent right to have the payments set off against her liability.