Charles B. **BENENSON** and Dorothy Cullman, Plaintiffs,

v.

**UNITED STATES** of America, Defendant.

No. 64 Civ. 1445.

United States District Court
S. D. New York.
July 18, 1966.

Charles C. Cohen, New York City, for plaintiffs.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, for defendant, Laurence Vogel, Samuel M. Eisenstat, Asst. U. S. Attys., of counsel.

OPINION, FINDINGS OF FACT
and
CONCLUSIONS OF LAW

LEVET, District Judge.

Plaintiffs, Charles B. Benenson and Dorothy Cullman, seek a refund of tax deficiencies paid by plaintiffs on federal income tax returns for the taxable years 1955 and 1956.

This case was heard on a stipulation of facts. After examining the stipulation, the exhibits, the pleadings, the briefs and proposed findings of fact and conclusions of law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Charles B. Benenson ("Benenson") and Dorothy Cullman (formerly Dorothy Benenson) filed joint returns as husband and wife for the taxable years 1955 and 1956.

2. Each of the aforementioned federal income tax returns was filed with the District Director of Internal Revenue for the Upper Manhattan District, New York.

3. In connection with the transaction described herein, the taxpayers reported in their federal income tax returns for the years 1955 and 1956 respectively the following:

(a) In their federal income tax return for the taxable year 1955 the taxpayers claimed an interest deduction in the amount of $67,550;

(b) In their federal income tax return for the taxable year 1956 the taxpayers reported a long-term capital gain in the amount of $60,000.

4. The aforementioned interest deduction in 1955 and capital gain in 1956 related to certain purported loan, purchase and sale transactions between and among Benenson, Corporate Finance and Loan Corporation of Boston, Massachusetts ("Corporate") and one M. Eli Livingstone, a Boston broker and securities dealer operating through Livingstone & Co., a sole proprietorship.

5. This purported loan, purchase and sale transaction was suggested, planned, promoted and directed by Mr. Livingstone. It consisted of the purported financing of Benenson's purchase of $2,000,000 of U. S. Treasury 1⅞% Notes due February 15, 1959 with 8/15/55 and 2/15/56 interest coupons detached.

6. The purchase price of these notes was $1,930,000, and Benenson, through Mr. Livingstone, agreed to borrow from Corporate and Corporate agreed to lend to Benenson this entire amount on May 12, 1955.

7. Interest on this purported loan in the amount of $67,550 was prepaid by Benenson with $17,500 of his own funds and $50,000 through cash obtained by him from another loan, also dated May 12, 1955, from the Court Finance and Loan Corporation ("Court"), a loan which was also obtained by Mr. Livingstone for Benenson, and which was repaid by him to Court as follows: $15,000 on July 11, 1955 and $35,000 on February 16, 1956.

8. Concurrently, Livingstone prepared promissory notes to the order of Corporate and Court which were to be executed by Benenson as security for the aforementioned loans.

9. The promissory notes were received by Benenson from Livingstone, were executed by Benenson and sent back to Livingstone for delivery to Corporate and Court.

10. As additional security for the above loans, Benenson purported to assign the entire amount of U. S. Treasury Notes, which presumably were to be purchased by Livingstone for Benenson's account, to Corporate, along with the right to hypothecate and use the securities pledged for any purpose while so pledged, but such right was not to be inconsistent with the ownership by Benenson of such collateral or with his right to obtain the return of the collateral at any time upon tender of payment of the amount due to Corporate.

11. In addition to all of the above purported transactions, Livingstone granted to Benenson a "put," to sell to Livingstone, if Benenson so desired, the U. S. Treasury Notes on February 15, 1956, at a price of $1,990,000.

12. In point of fact, the essential elements of the above dealing took place on May 12, 1955 as follows:

(a) Livingstone received a commitment from Benenson to purchase the Treasury Notes; Benenson received a commitment from Corporate to lend him

the entire purchase price, and Benenson agreed to pledge the Notes to be purchased to Corporate as collateral along with the right to hypothecate and use the Treasury Notes for any purpose while they were so pledged provided that such right was not to be inconsistent with the ownership by Benenson of such collateral or with Benenson's right to obtain the return of the collateral at any time upon tender of payment of the amount due to Corporate.

(b) Livingstone then purportedly purchased the Treasury Notes from a listed securities dealer against his account. Livingstone ostensibly purchased these Notes for the account of Benenson, but in view of his prior loan and pledge commitment, Benenson never actually received the U. S. Treasury Notes.

(c) Subsequent to the alleged purchase of the Notes by Livingstone, but prior to their delivery to Corporate, the latter sold the Notes "short" to Livingstone, purportedly pursuant to the authority contained in the pledge agreement and its right to hypothecate and use the Notes during the pledge period.

(d) Livingstone then purportedly sold the Notes back to the dealer from whom he had purportedly purchased them earlier in the day, having his account credited accordingly.

13. No U. S. Treasury Notes were actually delivered by Livingstone to Benenson, or to any finance company, for the benefit of Benenson.

14. Except for bookkeeping entries no funds were actually transferred between Livingstone and Corporate for Benenson's benefit in purchasing the U. S. Treasury Notes. In point of fact, Corporate never had funds sufficient to make the loan purportedly made by it to Benenson.

15. The transactions set forth in paragraphs 12(b)-(d) were essentially book transactions.

16. Insofar as Benenson was concerned, however, he assumed and believed that the transactions involved would be genuine.

17. On February 15, 1956, Benenson purportedly sold the Treasury Notes to Livingstone for $1,990,000, receiving a check for $60,000 which represented the excess of the sales price of $1,990,000 over the loan due Corporate.

18. In connection with the aspect of the transaction described in Finding 17, Benenson was informed by Livingstone that he had paid $1,930,000 to Corporate to obtain Benenson's promissory notes, thus purportedly extinguishing the loan from Corporate to Benenson.

19. In their federal income tax returns for the taxable year 1956 the taxpayers recognized a long-term capital gain in the amount of $60,000 arrived at by deducting from the $1,990,000 sales price of the Notes, the sum of $1,930,000, the original cost of the Notes.

20. Benenson's economic loss with respect to the entire transaction, which terminated in February 1956, amounted to $7,550.

21. In January 1959, as a result of an audit of taxpayers' income tax returns for the years 1955 and 1956, the examining Revenue Agent submitted to taxpayers for their signature a Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, Form 870, containing (i) a proposed deficiency in tax for the year 1955 in the amount of $47,831.12 based on the disallowance of the $67,550 interest deduction, and (ii) an overassessment for the year 1956 of $14,700, resulting from the elimination of the tax attributable to the long-term capital gain reported by taxpayer in 1956 in respect of the purported sale of the U. S. Treasury Notes. The taxpayers executed this waiver and filed it with the District Director of Internal Revenue, Upper Manhattan, on January 27, 1959.

22. (a) Shortly after the filing of said waiver, the examining Revenue Agent requested that taxpayers execute also a closing agreement with respect to the year 1955 which would bar the taxpayers from filing a claim for refund with respect to the disallowed interest deduction; the taxpayers refused to exe-

cute such closing agreement. Subsequently, on April 7, 1959, the taxpayers executed a Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, Form 870. The April 7, 1959 waiver contained (i) a proposed deficiency in tax for the year 1955 in the amount of $47,831.12 based on the disallowance of $67,550 interest deduction, and (ii) a proposed deficiency in tax for the year 1956 in the amount of $207.30 resulting from the inclusion of the tax attributable to the long-term capital gain reported by the taxpayers in 1956 in respect of the purported sale of the U. S. Treasury Notes.

(b) However, the taxpayers informed the examining Agent that they reserved the right to file a claim for refund for the capital gains portion of the tax for the year 1956.

23. On May 27, 1959 and thereafter during the taxable year 1959, the taxpayers paid to the District Director on account of such assessments the sum of $56,539.49 ($47,831 plus interest) for 1955 and $207.30 for 1956.

24. On May 16, 1961, the taxpayers filed with the District Director on Form 843 a claim for refund for the year 1955 in the amount of $47,831 as well as a claim for refund on Form 843 for the year 1956 in the amount of $14,967.30.

25. These claims for refund were in the alternative and were based on the failure of the District Director to take into account the amount of $67,550 as a deduction in computing taxpayers' income both in 1955 and 1956.

26. The District Director disallowed the claim for refund for 1955 in full, and the claim for refund for 1956 in excess of $207.30.

27. The taxpayers admit that their basic purpose in entering into this entire transaction with Livingstone was to obtain the tax benefit which they believed it afforded; and although the taxpayers believed that some potential profit could result from an increase in value of the U. S. Treasury Notes, the taxpayers would not have entered into the transaction if the interest deduction were not allowable.

28. For purposes of this proceeding, Corporate was, in essence, a Livingstone controlled nominal finance corporation. Livingstone suggested that it be formed; all of Corporate's business came from Livingstone, substantially all, if not all, of the "interest" payments made to Corporate pursuant to the "loan" transaction involved in this and other similar cases were paid over to Livingstone as compensation for "various services."

29. For purposes of this proceeding, Court was, in essence, a Livingstone controlled nominal finance corporation; Livingstone suggested that it be formed and, in fact, advanced the funds required for its initial capitalization; all of Court's business was generated by Livingstone, the funds needed for "loans" that it made pursuant to Livingstone's instructions were advanced by Livingstone, and were paid back to him when the "loans" were "paid off" by the borrowers.

## DISCUSSION

### I

The first issue, namely, whether the taxpayers are entitled to an "interest" deduction for the taxable year 1955 in the amount of $67,550 paid to Corporate as a part of the transaction involving the purported purchase of $2,000,000 face value of U. S. Treasury Notes, may be disposed of summarily. Livingstone transactions similar to the transaction involved in the present case have previously been subject to judicial scrutiny. See, e. g., Jockmus v. United States, 335 F.2d 23 (2nd Cir. 1964); Lewis v. Commissioner of Internal Revenue, 328 F.2d 634 (7th Cir. 1964) cert. denied 379 U.S. 821, 85 S.Ct. 43, 13 L.Ed.2d 32 (1964); Nichols v. Commissioner of Internal Revenue, 314 F.2d 337 (1st Cir. 1963); MacRae v. Commissioner of Internal Revenue, 294 F.2d 56 (9th Cir. 1961) cert. denied 368 U.S. 955, 82 S.Ct. 398, 7 L.Ed.2d 388 (1962); Becker v. Commissioner of Internal Revenue, 277

F.2d 146 (2nd Cir. 1960); Lynch v. Commissioner of Internal Revenue, 273 F.2d 867 (2nd Cir. 1959); Goodstein v. Commissioner of Internal Revenue, 267 F.2d 127 (1st Cir. 1959); Broome v. United States, 170 F.Supp. 613, 145 Ct. Cl. 298 (1959). The learning of the above cases is clear, and their reasoning settles beyond doubt that no "interest" deduction is available to the taxpayers here. There must be an actual "indebtedness" on which the "interest" is paid. Here there was none; all that took place were transactions which lack substance and which must be ignored for tax purposes. The "financial round robin was only a paper transaction." Broome v. United States, supra, 170 F. Supp. at 613. No matter how genuine the intentions of the taxpayers may have been as to the transaction, their intentions do not control. Jockmus v. United States, supra, 335 F.2d at 27–29. Accordingly, I hold that the taxpayers are not entitled to an interest deduction under Section 163 of the Internal Revenue Code of 1954, 26 U.S.C. § 163, since no required "indebtedness" was created.

## II

The second issue is whether the taxpayers are entitled to a deduction of $67,550 on any other theory in the taxable year 1955.

■ The taxpayers cite MacRae v. Commissioner, supra; Becker v. Commissioner, supra; Lynch v. Commissioner, supra; and Goodstein v. Commissioner, supra, as authority for the proposition that the taxpayers are entitled to deduct their out-of-pocket loss on the transaction and that such deduction may be accomplished by a deduction of $67,550 in 1955. The cases cited indicate that a deduction for the taxpayers' out-of-pocket loss is allowable in the year in which the transaction is completed. But see cases contra, Lewis v. Commissioner, supra, 328 F.2d at 639–640; Morris R. DeWoskin, 35 T.C. 356, 362–364 (1960) (disallowing out-of-pocket loss deduction). Here, the transaction was not completed until 1956. Accordingly,

a deduction for the out-of-pocket loss, if available, must come entirely in 1956. The deduction may not be accomplished by a $67,550 loss deduction in 1955 coupled with a $60,000 capital gain inclusion in 1956.

■ The taxpayers also claim that they are entitled to a capital loss deduction of $67,550 in 1955 on the ground that such amount, which purportedly was paid as "interest," constituted in reality the cost of a "right" to obtain a loan in 1955, which "right" became worthless in 1955 because no loan was in fact made. From an examination of the cases, it appears that this argument has not previously been advanced. However, the principles enunciated in the cases disclose the fallacy in the taxpayers' argument. They would split the transaction, separating the purported loan from the purported purchase of Treasury Notes as if they constituted completely independent transactions. No independence is present here. Cf. Jockmus v. United States, 335 F.2d supra at 29. The entire transaction, including the loan, was a sham. In my opinion, any "right" to obtain the loan is infected with the same taint, regardless of the taxpayers' intentions. Accordingly, no capital loss deduction is allowable for the worthlessness of such "right." Cf. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

## III

■ The third question is whether the taxpayers are entitled to a refund for 1956 on the basis of a deduction of $67,550 in 1956. The MacRae, Becker, Lynch and Goodstein cases, supra, support such a deduction in order that the out-of-pocket loss on the transaction may be recognized in the year in which the transaction is completed. Contra, Lewis v. Commissioner, supra; Morris R. DeWoskin, supra. No refund, however, may be granted unless the jurisdictional requisites of a tax refund action are satisfied.

Among the requirements for a tax refund action is the timely filing of a claim for refund. 26 U.S.C. §§ 7422(a), 6511

(b) (1). The refund claim must be filed within two years from the time the tax was paid or within three years from the time the return was filed, whichever is later. 26 U.S.C. § 6511(a). In the present case, it is conceded that no formal claim for refund as to 1956 was filed until after the expiration of the statutory period. The taxpayers, however, argue that an "informal claim" which will satisfy the timely claim requirement was made within the statutory period. Specifically, the taxpayers contend that an informal claim is made out by (1) their execution on January 27, 1959 of a Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, Form 870 (Finding of Fact 21), (2) their execution on April 7, 1959 of another Waiver on Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, Form 870 (Finding of Fact 22(a)), and (3), the fact that on April 7, 1959 they informed an examining Revenue Agent that they reserved the right to file a claim for refund for the capital gains portion of the tax for the year 1956 (Finding of Fact 22(b)).

■ The taxpayers' attempt to fashion an informal claim out of the above circumstances must fail. For an informal claim to be held valid, it "must have a written component [citations omitted], and should adequately apprise the Internal Revenue Service that a refund is sought and for certain years. [Citations omitted]. It is not enough that the Service have in its possession information from which it might deduce that the taxpayer is entitled to, or might desire, a refund; nor is it sufficient that a claim involving the same ground has been filed for another year or by a different taxpayer. [Citations omitted]. * * *" American Radiator & Standard Sanitary Corp. v. United States, 318 F.2d 915, 920 (Ct.Cl.1963).

■ Nothing in this case satisfies the requirement of a written component. The Waiver of Restrictions forms executed by the taxpayers, standing alone, cannot do so because they specifically state that their execution and filing do not "extend the statutory period of limitation for refunds, * * *." Cumberland Portland Cement Co. v. United States, 104 F.Supp. 1010, 1013, 122 Ct.Cl. 580, (1952). Nor can the oral statement to the examining Revenue Agent satisfy the written component requirement. Ritter v. United States, 28 F.2d 265 (3rd Cir. 1928). The only possible written component is the Transmittal Letter of the Agent (Ex. 18B) in which he states that the taxpayers have informed him that they reserve the right to file a claim for refund. Reserving the right is not filing a claim. Moreover, a claim must come from a taxpayer, not from an Agent. See Cumberland Portland Cement Co. v. United States, supra. I hold, accordingly, that the taxpayers here have not filed a timely claim for refund, either formal or informal, as to the taxable year 1956 and are, therefore, precluded from asserting a refund claim as to that year unless some other legal doctrine mitigates the effect of the taxpayers' failure to file a timely claim.

## IV

■ The taxpayers' next contention is that under the circumstances of this case they should be allowed the benefit of Sections 1311–1315, Internal Revenue Code of 1954, 26 U.S.C. §§ 1311–1315, in order to mitigate the effect of their failure to file a timely claim for 1956. As is stated in 2 Mertens, Federal Income Taxation, § 14.02 at Ch. 14, p. 6 (1961 rev.):

"* * * The party who invokes these sections must plead them and assume the burden of proving all the prerequisites to their application."

This formulation of the burden borne by one claiming the benefit of these sections is approved by numerous courts. United States v. Rigdon, 323 F.2d 446 (9th Cir. 1963); Taxeraas v. United States, 269 F.2d 283 (8th Cir. 1959); Sherover v. United States, 137 F.Supp. 778 (S.D.N.Y.) (Weinfeld, J.), aff'd per curiam 239 F.2d 766 (2nd Cir. 1956).

And see Commissioner v. Goldstein's Estate, 340 F.2d 24 (2nd Cir. 1965), approving a "strict construction" of the provisions involved herein. The taxpayers, under these decisions, have the burden of demonstrating the presence of each of the requirements necessary for the application of the mitigation provisions.

Section 1311(a) provides as follows:

"§ 1311. Correction of error

"(a) General rule.—If a determination (as defined in section 1313) is described in one or more of the paragraphs of section 1312 and, on the date of the determination, correction of the effect of the error referred to in the applicable paragraph of section 1312 is prevented by the operation of any law or rule of law, other than this part and other than section 7122 (relating to compromises), then the effect of the error shall be corrected by an adjustment made in the amount and in the manner specified in section 1314."

■ Thus, Section 1311 makes one of the prerequisites for application of the mitigation provisions " * * * a determination (as defined in section 1313) * * *." Absent such a determination, there can be no relief through use of the mitigation statute. See 2 Mertens, supra, § 14.11; Cf. Taylor v. Commissioner, 258 F.2d 89, 92 (2nd Cir. 1958).

Section 1313 provides in relevant part as follows:

"§ 1313. Definitions

"(a) Determination.—For purposes of this part, the term 'determination' means—

"(1) a decision by the Tax Court or a judgment, decree, or other order by any court of competent jurisdiction, which has become final;

"(2) a closing agreement made under section 7121;

"(3) a final disposition by the Secretary or his delegate of a claim for refund. For purposes of this part, a claim for refund shall be deemed final-

ly disposed of by the Secretary or his delegate—

"(A) as to items with respect to which the claim was allowed, on the date of allowance of refund or credit or on the date of mailing notice of disallowance (by reason of offsetting items) of the claim for refund, and

"(B) as to items with respect to which the claim was disallowed, in whole or in part, or as to items applied by the Secretary or his delegate in reduction of the refund or credit, on expiration of the time for instituting suit with respect thereto (unless suit is instituted before the expiration of such time) ; or

"(4) under regulations prescribed by the Secretary or his delegate, an agreement for purposes of this part signed by the Secretary or his delegate, and by any person, relating to the liability of such person (or the person for whom he acts) in respect of a tax under this subtitle for any taxable period."

■ Subdivisions (2) and (4) clearly do not apply here. No such agreement exists. Subdivision (3) does not apply because suit for refund was commenced even before the claims for refund for the years 1955 and 1956 were disallowed, a refund of $207.30 for the year 1956 being allowed after the suit was commenced, however. Thus, no "determination" within the meaning of the statute can be derived from the actions of the Secretary or his delegate herein. As is said in 2 Mertens, supra, § 14.14 at Ch. 14, p. 52:

"When the taxpayer's claim with respect to an item is disallowed in whole or in part and even though his contention is sustained as to other items so that a refund or credit is allowed, there is no final disposition until expiration of the two-year statutory period for instituting suit on the claim (unless suit is instituted prior to the expiration of that period) [footnotes omitted]."

See also Maguire, Surrey, and Traynor, Section 820 of the Revenue Act of 1938, 48 Yale L.J. 509, 719, 720–721 (1939); 26 U.S.C. § 6532(a). The actions of the Commissioner constitute no "determination" herein.[1]

Thus, only Section 1313(a) (1) may supply the determination requisite to application of the mitigation statute. That section requires "a decision by the Tax Court or a judgment, decree, or other order by any court of competent jurisdiction, which has become final." Two possible theories exist for asserting that such a final decision is present here.

First, it may be argued that the judgment herein may supply this final determination for the year 1955, which is necessary in order to apply the mitigation provisions to the year 1956. However, the great weight of authority is to the contrary. The Second Circuit in Yagoda v. Commissioner, 331 F.2d 485 (2nd Cir.), cert. denied 379 U.S. 842, 855 S.Ct. 81, 13 L.Ed.2d 48 (1964), held that, for purposes of the mitigation provisions, the judgment of the district court became a final determination when a notice of appeal therefrom which had been filed was dismissed by stipulation. In Taylor v. Commissioner, 258 F.2d 89 (2nd Cir. 1958), the Second Circuit affirmed a decision of the Tax Court that the mitigation statute should not be applied to the case then before the court. The court held, per Lumbard, Circuit Judge (now Chief Judge), that the Tax Court was without jurisdiction to grant or deny relief under Sections 1311–1315. The statute could be invoked only after a "determination," which as statutorily defined included a decision of the Tax Court which had become "final." But by statute the decision of the Tax Court does not become final until the means of appellate review have been exhausted or barred by the passage of time. The Tax Court thus could not use its own non-final decision as the basis for the application of the mitigation-related taxpayer statute. (258 F.2d at 92–93). Mertens cites this case for the proposition that, "Since there is no determination until a Tax Court decision becomes final, the Tax Court lacks jurisdiction to consider possible relief by way of an adjustment for some other year in the same proceedings from which the determination results." 2 Mertens, supra, § 14.12 at Ch. 14, p. 48.

Moreover, in Estate of Gill, 35 T.C. 1208 (1961), it was said that a decision of the Tax Court becomes final at the time the determination is beyond review and thus fixed. The Tax Court held that this concept of the term "become final" is also appropriate to a judgment of the District Court or Court of Appeals, as in the case then before it, for purposes of the mitigation statute. Other uses of the word "final," as in petitions for certiorari or appeals to Courts of Appeals, were distinguished. 35 T.C. at 1214–1215. This decision was affirmed by the Fifth Circuit in a unanimous decision, Gill v. Commissioner, 306 F.2d 902 (5th Cir. 1962). This decision held that, for purposes of the mitigation statute, there is no determination at least until the Court of Appeals issues its mandate after decision upon an appeal from a judgment in the District Court. 306 F.2d at 905–906. A similar conclusion was reached as well in Bishop v. Reichel, 127 F.Supp. 750, 54 A.L.R.2d 532 (N.D.N.Y.1954), aff'd on opinion below 221 F.2d 806 (2nd Cir.), cert. denied 350 U.S. 833, 76 S.Ct. 68, 100 L.Ed. 743 (1955), which held that the determination is made when the mandate of the Court of Appeals is filed. Cf. Shields v. United States, 65–1 U.S.T.C. ¶ 9356 (N.D.Ohio 1965) (determination made "only upon the ultimate disposition of a

---

1. Of course, even if the Commissioner's action for the year 1956 did constitute such a determination for the purposes of this action, which it does not, application of the mitigation provisions could not be based thereon since the year 1955 is still open with respect to this controversy, and thus one of the other requirements of Section 1311(a) could not be met, to wit, that correction of the error be prevented by operation of any law or rule of law.

tax dispute."). Mertens, after noting that the date upon which finality is achieved for purposes of the mitigation statute must be decided on the basis of the facts of each case, states further:

" * * * Ordinarily, a judgment of a United States District Court becomes final upon the expiration of the time allowed for taking an appeal, if no such appeal is duly taken within such time * * *." 2 Mertens, supra, § 14.12 at Ch. 14, p. 49.

The tax for the year 1955 is being actively litigated here. Plaintiffs do not strenuously press their supposed right to the interest deduction, noting that other courts have rejected this claim in similar cases. They do still, argue strongly however, for a capital loss in the sum of $67,550 for the year 1955 as a result of this transaction. (See Plaintiffs' Brief and Reply Brief, especially page 4 of the latter).[2] The United States Attorney devotes portions of his brief to the interest deduction and also to other alleged deductions due to this transaction for the year 1955.

▮ Thus, there will be a determination of the tax due for the year 1955 when the decision herein becomes final, that is, at least not until judgment against plaintiffs dismissing their complaint for the year 1955 is settled and signed and the time in which to obtain review has expired. Until such time, this decision cannot supply the determination requisite to the application of Sections 1311–1315. In light of the authorities set out above, and the facts of the present case, if Esterbrook Pen Co. v. United States, 60–2 U.S.T.C. ¶ 9609 (D.N.J.1960) holds to the contrary, it is erroneous.

The second argument which might be advanced in order to find a determination present here is that a determination was made for this case in other similar

cases which have been litigated. Mertens points out that:

"The case law holds that there need not be a determination regarding the taxable year in question, if it is clear that the facts are identical with facts about which a determination has been made in some other year." 2 Mertens, supra, § 14.11 (1965 Cum.Supp. at 208).

Two cases are cited for this proposition. These are H. T. Hackney Co., Inc. v. United States, 78 F.Supp. 101, 111 Ct. Cl. 664, (1948) and Rigdon v. United States, 197 F.Supp. 150 (S.D.Cal.1961). See also Commissioner v. Weinreich's Estate, 316 F.2d 97 (9th Cir. 1963). I need not pass on the correctness of these decisions. I note that all of them involved either the same taxpayer or another participant in the transactions as to which a determination had been made for some other year. Moreover, in none of them was the taxpayer then attempting to litigate the tax due in the very year as to which it was claimed that a determination, in effect, had already been made adversely. Finally, the argument with respect to considering the right to receive a loan as an asset which became worthless in 1955 is somewhat novel and does not appear to have been definitely litigated in this context heretofore. These cases, then, do not apply here.

In enacting the determination requirement, Congress was quite aware of the limitations which it was placing on the applicability of the mitigation statute. The Senate Finance Committee, in the Report which accompanied the predecessor of present Sections 1311–1315,[3] said:

"Inasmuch as an adjustment should not be made until the inconsistent position asserted by the taxpayer or the Commissioner has been successfully maintained, subsection (b) is not

---

2. See also Plaintiffs' claim for the year 1955, dated May 15, 1961 (Ex. B) pars. 5, 12–14; complaint, pars. 10, 18, 21; Plaintiffs' Proposed Conclusions of Law, "A. With respect to the year 1955."

3. The mitigation statute was originally enacted as Section 820 of the Revenue Act of 1938, 52 Stat. 447, 581 et seq. (1938).

operative until there is a final 'determination' which gives authoritative sanction to the inconsistent action. Subsection (a) describes the types of determinations which are prerequisite to the operation of this section." S. Rep.No.1567, 75th Cong., 3rd Sess., p. 50.

In 1954,[4] Congress, mindful of the restrictive scope of the determination requirement, sought to liberalize it by providing one new route through which to obtain a "determination." This new route is embodied in Subsection (4) of Section 1313(a). It was enacted in order to allow informal agreements, which could deal at once with both closed and open years, to have the force of "determinations." This determination could be entered into in the field, thus expediting the arrangement when the parties could agree on the treatment to be accorded both years. The agreement did not prevent either side from taking action contrary to it, but any determination made due to such action would be held to modify or revoke the agreement. Section 1313(a) (4), Internal Revenue Code of 1954, 26 U.S.C. See H.R.Rep.No. 1337, 83rd Cong., 2nd Sess., pp. 85–86, A292; S.Rep.No. 1662, 83rd Cong., 2nd Sess., pp. 116–117, 449 U.S.Code Cong. & Admin.News 1954, p. 4025.[5] The Regulations under this subsection, Treas. Reg. § 1.1313(a)–4(d), provide that the determination made by this sort of agreement becomes final when the tax liability for the open taxable year to which the determination relates becomes final. Thus, Congress has, over the years, consistently recognized the necessity of "finality" before the mitigation provisions of the Code can be invoked.

The examining Revenue Agent requested in 1959 that the taxpayers execute a closing agreement with respect to their tax liability for the year 1955. This would have constituted a determination for purposes of the mitigation statute, Section 1313(a) (2), Internal Revenue Code of 1954. Taxpayers, however, refused to execute any such agreement.[6] Again, if, upon reading reports of cases similar to this one, taxpayer had so desired, a consent judgment could have been entered with respect to the year 1955. This would have constituted a determination for purposes of the mitigation statute, Section 1313(a) (1), 26 U.S.C., upon its becoming final as discussed above. See Shields v. United States, supra. Taxpayers chose to litigate in the year 1955. They have steadfastly contested their tax liability for 1955. To ignore this now and to find a "determination" of their liability for 1955 from other similar cases, when taxpayers apparently feel the other cases are sufficiently non-determinative to justify them in persisting with the year 1955, would be, in my opinion, to ignore the Congressional requirement of finality. Such a result would not comport with orderly procedures, and could lead, in my opinion, to considerable unpredictability in the timing of the application of the mitigation statute. The statute was designed, in fact, to avoid such indefiniteness. Moreover, any extension of the three cases which were discussed above to the facts of the present case, in order to find a "determination" here, would surely not comport with the "strict" construction of these provisions which is required by the Second Circuit, Yagoda v. United States, supra. Thus,

---

4. Reenactments and modifications of the mitigation statute between 1938 and 1954 had maintained the determination requirements substantially as originally enacted.

5. Statements at the last cited page, which refer to settlement on a net basis, when read in conjunction with all the above history, clearly refer to settlement under the new informal agreement procedure.

6. This fact may indeed be one of the reasons that no voluntary agreement with respect to the year 1956 has yet been reached, the Service believing that no "determination" for 1955 yet has been achieved.

until this decision for the year 1955 becomes final, the mitigation statute can supply no relief to taxpayers for the closed year 1956.

## V.

One difficult question remains in the case. That is whether the doctrine of Bull v. United States, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935), as limited by Rothensies v. Electric Storage Battery Co., 329 U.S. 296, 67 S.Ct. 271, 91 L.Ed. 296 (1946), applies herein. This doctrine is usually referred to as the doctrine of equitable recoupment.[7]

 It may well be that it was to this doctrine which the Second Circuit adverted in Taylor v. Commissioner, 258 F.2d 89 (2nd Cir. 1958), when it noted in a case similar to this one that the Tax Court has no equitable jurisdiction. 258 F.2d at 92–93. That the District Court has such equitable jurisdiction in an action like the present one, and, indeed, that a refund action is equitable in nature, is beyond dispute. Bull, supra; Rothensies, supra, 329 U.S. at 303, 67 S.Ct. 271; Stone v. White, 301 U.S. 532, 57 S.Ct. 851, 81 L.Ed. 1265 (1937). Certainly, the view I take of the transaction herein would seem clearly to bring it within the single transaction requirement of Rothensies, supra.[8] Moreover, it appears that if recoupment is ever to be applicable to this transaction it must be while one of the years involved therein is still open. Once 1955 becomes closed, recoupment will not be available since 1956 is already closed.

 The Second Circuit has admitted some question with respect to the extent to which equitable recoupment is still available to a taxpayer.[9] However, it is clear that the doctrine does survive in certain situations at least. Boyle v. United States, 355 F.2d 233 (3rd Cir. 1965); United States v. Bowcut, 287 F.2d 654 (9th Cir. 1961).[10] And cf. Mercado v. United States, 64–1 U.S.T.C. ¶9209 at 91,464–91,465 (2nd Cir. 1964) (order requiring briefs on additional issues).

 It is clear as well, however, that equitable recoupment does not apply in those situations in which the mitigation statute provides, or will provide, a remedy. Gooding v. United States, 326 F.2d 988, 994–996 (Ct.Cl.), cert. denied 379 U.S. 834, 85 S.Ct. 67, 13 L.Ed.2d 42 (1964); Maguire, Surrey and Traynor, supra, at 719, 773–775; Note, 72 Harv.L. Rev. 1536, 1537 n. 8 (1959); and see Wells Fargo Bank v. United States, 245 F.2d 524, 535–536 (9th Cir. 1957). Cf. S.Rep.No.1567, 75th Cong., 3rd Sess., p. 49 ("uniform, systematic solution of these problems" apparently desired).

---

7. Although probably included in the general plea for equitable relief included in the original complaint, the plaintiffs on July 13, 1966 moved to amend their complaint to include a specific plea for relief under the doctrine of equitable recoupment. The government stated that it had no objection to the amendment. The motion to amend was granted. The government contends, inter alia, that any possible equitable relief for plaintiffs must await their actual exhaustion of possible legal remedies, the availability of which should not be determined here.

8. Contrast this situation with that in Wood v. United States, 213 F.2d 660, 661 (2nd Cir. 1954).

9. " * * * Frankly, we do not know just how much of that doctrine still lives." Wood v. United States, supra, 661 (Frank, J.).

10. This case supports the conclusion, and I hold, that the doctrine of unclean hands is not applicable to these plaintiffs. While the doctrine of unclean hands may possibly be applicable under some circumstances, but cf. Dysart v. United States, 340 F.2d 624 (Ct.Cl.1965), the circumstances herein do not justify its application. Decisions striking down transactions such as this were not handed down until years after this transaction took place. No assumption of fraudulent or otherwise reprehensible behavior on the part of these plaintiffs is justified on the basis of the record herein. They merely claimed interest deductions to which they thought themselves entitled, treating the transaction consistently therewith in the second year.

Therefore, if the mitigation provisions will provide relief to these taxpayers once the decision with respect to 1955 has become final, equitable recoupment should not now be applied.[11] I pass to this inquiry.[12]

■ The question of the application of the mitigation statute depends in part on whether this circuit adheres to Becker v. Commissioner, 277 F.2d 146 (2nd Cir. 1960) in light of contrary decisions in Lewis v. Commissioner, 328 F.2d 634 (7th Cir.), cert. denied 379 U.S. 821, 85 S.Ct. 43, 13 L.Ed.2d 32 (1964), and Morris R. DeWoskin, 35 T.C. 356 (1960). Cf. Cahn v. Commissioner, 358 F.2d 492, 495 (9th Cir. 1966) (dissenting opinion by Chambers, J.). This question was left open in Jockmus v. United States, 335 F.2d 23, 30 (2nd Cir. 1964). The point at issue in these cases is the proper treatment to be accorded the overall economic "loss" realized in a sham transaction such as this. Becker holds that this is a capital loss, attributable to a failure to exercise an option, currently under § 1234, Internal Revenue Code of 1954, 26 U.S.C. Accord, MacRae v. Commissioner, 294 F.2d 56 (9th Cir. 1961), cert. denied 368 U.S. 955, 82 S.Ct. 398, 7 L.Ed.2d 368 (1962). Lewis rejects this treatment and casts considerable doubt on the proposition that any loss may be realized for tax purposes in a sham transaction. 328 F.2d at 640. Cf. Cahn v. Commissioner, supra, 358 F.2d at 495 (dissenting opinion). Since Becker is still the law in this circuit, I treat that decision as determining the proper overall treatment of this sham transaction.

In light of the above discussion with respect to proper overall treatment of this transaction and the Second Circuit's holding in Becker, I believe that the mitigation statute will be applicable to this situation.

I believe that the "circumstance of adjustment" which will apply is that contained in Section 1312(4), Internal Revenue Code of 1954, "Double disallowance of a deduction * * *." This is supported by the wording of Sections 161 and 165 of the Code. Moreover, this seems to be so even though the taxpayers did not claim the capital loss deduction in the closed year.[13] Further, as Mertens says:

"There is no requirement in Section 1312(4) that the deductions be of the same type so long as they are based on the identical transaction." 2 Mertens, supra, § 14.08a at Ch. 14, p. 38.

See Olin Mathieson Chemical Corp. v. United States, supra.[14] Thus, I believe

---

11. I do not decide the question whether the mitigation provisions provide the sole remedy in cases in which income taxes *only* are involved, in light of my conclusion below with respect to the statute's specific applicability to this case. Little authority has been found for such a broad preemption, however. See 2 Mertens, supra, § 14.22 at Ch. 14, p. 71; Maguire, Surrey and Traynor, supra at 773–775; cf. Mercado v. United States, supra. The Senate Finance Committee in its Report accompanying the predecessor of the present statute, stated: " * * * Legislation has long been needed to *supplement* the equitable principles applied by the courts * * *." S.Rep. No. 1567, 75th Cong., 3rd Sess., p. 49. (Emphasis added.)

12. A procedure close to that being followed here, namely, deciding whether the mitigation statute will afford an adequate remedy, was followed in Gooding v. United States, supra. This case specifically

holds at 326 F.2d 994–996 that equitable recoupment does not apply to the notes not paid in 1947 or 1948, because the mitigation statute will grant relief if they are treated as dividends by the Commissioner, when and if they are paid. Thus, Gooding strongly supports the procedure followed here.

13. Support for this proposition is furnished both by the "bad debt" example appearing in § 14.08a of 2 Mertens, supra, and by the Comment at 1 U.C.L.A.L.Rev. 60, 68–70 (1953). See also Olin Mathieson Chemical Corp. v. United States, 265 F.2d 293 (7th Cir. 1959). Further, such a construction seems to comport with the purpose of the statute. No contrary authority has been found.

14. I take note of, but do not rely upon, the broader definition of "deduction," defined to include the "cost" of $67,550 for the securities, by which definition plaintiffs urge that a deduction was denied to

that if Becker is adhered to by the Second Circuit, the mitigation statute will apply.[15] Equitable recoupment should not, therefore, be applied herein.

Should the Second Circuit adopt the position of the Lewis case, however, the situation would be somewhat different. Then, the best description of the actions of the parties would seem merely to be a disallowance of a deduction in one year and an erroneous inclusion in gross income in another. Thus, none of the "circumstances of adjustment" of Section 1312 would seem to apply.[16] Under these circumstances, it might be appropriate to apply equitable recoupment in the year 1955. This at present, however, need not be decided. For the reasons stated, under the current state of the law in this circuit, I decline to apply equitable recoupment herein.

## CONCLUSIONS OF LAW

1. The transaction herein was a sham transaction. No bona fide indebtedness was created thereby. No interest deduction is therefore allowable to the tax-

payers for 1955. 26 U.S.C. § 163. The transaction was not completed until 1956. Nor did the taxpayers acquire a "right" to obtain a loan, which "right" became worthless in 1955. Thus, under no theory are the taxpayers entitled to the deduction of $67,550 which they claim for 1955.

2. The taxpayers failed to file a timely formal claim for refund for 1956. They failed to file a timely informal claim for refund for 1956 as well.

3. There has as yet been no "determination" within the meaning of the statute with respect to the taxpayers' tax liability for the year 1955. Thus, the mitigation provisions can afford the taxpayers no relief at this time. 26 U.S. C. §§ 1311–1315.

4. The taxpayers are not entitled to equitable recoupment herein since they have an adequate statutory remedy. 26 U.S.C. §§ 1311–1315.

5. Plaintiffs' complaint must be dismissed with costs.

Settle judgment on notice.

them in computing the "loss" realized on this overall transaction in 1956. Such a "deduction" does not specifically appear in the Code. But cf. M. Fine & Sons Mfg. Co. v. United States, infra, and cases therein cited.

15. It seems to be straining to hold that disallowance of the interest deduction here is an "inclusion" in gross income for purposes of Section 1312(1), as may be suggested by Rigdon v. United States, 197 F.Supp. 150 (S.D.Cal.1961). But see M. Fine & Sons Mfg. Co. v. United States, 168 F.Supp. 769 (144 Ct.Cl. 46 1958).

In addition, it appears that the basic provisions of Section 1312(7) are inapplicable for at least the reason that the factual situation presented here does not met the requirement of a "prior" transaction erroneously treated, as required by that section.

All requisites to the application of Section 1312(4) seem to have been met here however, including maintenance in writing

that plaintiffs were entitled to an interest deduction for 1955 at a time when the statute of limitations did not act as a bar with respect to 1956.

16. See note 15, supra. On this basis, the result in Knowles Electronics, Inc. v. United States, 365 F.2d 43 (No. 15499, 7th Cir., June 24, 1966) may be correct. However, the statements contained therein implying that parties to a Livingstone transaction are never entitled to relief under the mitigation provisions, no matter what reporting "errors" may have been made, seem too broad. At least in the absence of fraud, which is not alleged in Knowles and is not alleged here, the selection of particularly "bad" taxpayers who are then denied mitigation seems questionable in light of the "uniform, systematic solution of these problems" which Congress evidently desired in enacting the original version of this statute. See S.Rep. No. 1567, 75th Cong., 3rd Sess., p. 49.